### COMMONWEALTH *vs.* JAMES V. IZZO.

Hampden.   January 4, 1971. — March 11, 1971.

Present: TAURO, C.J., SPALDING, CUTTER, SPIEGEL, REARDON, QUIRICO, & BRAUCHER, JJ.

*Evidence,* Fresh complaint, Corroborative evidence, On cross-examination, Photograph, Judicial discretion.  *Error,* Whether error harmful.

At the trial of an indictment for rape, there was no error in the admission in evidence as a fresh complaint, to confirm the victim's oral testimony, of a narrative statement of the incident signed by the victim at a police station several hours after commission of the crime, where there was evidence that after raping her the defendant said that a companion of his would "cut . . . [her] up" if she went to the police, that upon leaving the scene of the crime she attempted to telephone her mother, then conversed with several friends while the defendant was still in the vicinity, as the victim knew, and later went to the station with her mother, that she was highly distraught and physically bruised, and that the statement was merely a summary of her oral testimony and cumulative in effect.  [42–43]

At the trial of an indictment for rape in which fresh complaint by the victim was a material issue, error in not permitting the defendant to cross-examine the victim with respect to a conversation after commission of the crime with her mother, who accompanied her to a police station, was not prejudicial where unambiguous testimony of a friend of the victim who urged her to go to the police and of the victim's mother clearly showed that the victim complained to both of them.  [43–44]

At the trial of an indictment for rape against a defendant who testified on direct examination that certain photographs showing "the beard he was wearing, the swastikas on his motorcycle jacket, and his German helmet" were a fair representation of his appearance at the time of the alleged crime, there was no abuse of discretion in allowing the use of such photographs in cross-examination of defence witnesses.  [45–46]

INDICTMENTS found and returned in the Superior Court on September 9, 1968.

The cases were tried before *Chmielinski,* J.

*Stephen Axelrad* (*Reuben Goodman* with him) for the defendant.

*Matthew J. Ryan, Jr.,* District Attorney, for the Commonwealth.

SPIEGEL, J.   The defendant Izzo appeals under G. L. c. 278, §§ 33A–33G, from his convictions on indictments charging him with rape, kidnapping, and assault and battery.   A companion case against one Joseph Paige was tried together with this one, but is not before us on appeal.   The defendant argues three assignments of error, each of which concerns either the admission or the exclusion of evidence. We summarize only those portions of the evidence pertaining to these assignments.

The complainant testified that on June 5, 1968, she was employed as a junior clerk by the Neighborhood Youth Corps which was located in a building on State Street in the city of Springfield.   Her hours of employment were from 8:30 A.M. to 5 P.M.   As a part of her employment, when she had a "problem" that she "had at work" her "field foreman" would arrange an appointment for her with her "counsellor," also employed by the Neighborhood Youth Corps.   His office was in a building located at Oak and Union streets in Springfield.   On the day in question, she left her office to keep an appointment with her counsellor. She "went through the back way" and onto Charter Avenue, a narrow unpaved alleyway behind the State Street building, which was a shortcut to the building located at the corner of Oak and Union streets.   She arrived there at 2:30 P.M. and concluded her visit at 3:30 P.M., at which time she proceeded to return to her office.

As she was walking back and had turned onto Charter Avenue she saw a grey car parked in an opening just ahead. Izzo and Paige were seated on motorcycles next to the car. As she approached, Izzo called her "sweet britches."   She ignored him.   When she tried to "go behind the car . . . there was a blond [male] in the car that moved the car backwards," and he continued to move the car back and forth as she attempted to proceed.   She tried "to get away" but Paige "grabbed . . . [her] by the arm" and he had his hand over her mouth as he was pushing her toward the car.   She was forced into "the front seat between . . . [Paige] and the blond headed guy."   While in the car,

Paige "had his one hand on the back of . . . [her] neck and one on . . . [her] mouth." Her head was forced down on his lap. As the car began to move, she heard a motorcycle following it. They arrived at a house where Paige "said to go into the house like a young lady, and he had something in . . . [her] back and he said if you try to run, I will put it through your back and it was a sharp point."

She was "very scared and nervous" and after being forced into the house, Paige "dragged" her into a bedroom while she was crying and was trying to get away. Paige slapped her in the face, ripped her clothing off, "put his tongue into . . . [her] private" and raped her. Izzo then came into the bedroom. "He was screaming and he started choking" her; then he raped her. Afterward, when she threatened to go to the police, Izzo stated that if she did, Paige would "cut . . . [her] up." After Paige and Izzo left the house the complainant found her pocketbook on the living room floor. It was "ransacked . . . all opened and everything." Only twenty cents remained of close to $3 that had been in the pocketbook. After leaving the house, she observed Izzo following her. She ran into a drug store, "couldn't see no phone" whereupon she "ran right back out" and "ran down" to a telephone booth. Unable to reach her mother, she telephoned one of her girl friends. Thereupon, she walked downtown where, about 6 P.M., one William Cole, whom she knew, "picked" her up in his car.[1] After talking with Cole, he urged her to go immediately to the police. She was extremely scared and had seen Izzo's motorcycle parked outside a cafe. Subsequently, she and Cole met two of her girl friends, conversed with them while driving around, and again saw Izzo's motorcycle. After her two girl friends left the car, Cole drove her home where

---

[1] Cole testified that he and his wife knew the complainant; that he saw her on the day in question "just one street from" his house; that "she was standing with her hands like on her stomach"; that "she began to wave me down and . . . run towards the car"; and that he "brought the car to a stop and she got in the car." He testified as to her physical appearance at the time. Mrs. Cole also testified as to the complainant's physical appearance.

she spoke to her mother. About 10:30 P.M. she and her mother were driven to the police station by Cole.

At the station, two officers asked the complainant a series of questions, the answers to which they reduced to a narrative statement which she signed. It was prepared between 10:30 P.M. and 2:45 A.M. In the interim, Izzo was arrested.

Each of the Commonwealth's six witnesses testified that the complainant was highly distraught and physically bruised when they observed her on the evening of June 5.

In the first argued assignment, the defendant alleges error in the admission of the written statement given by the victim to the police several hours after the commission of the crimes. He asserts that it was hearsay and inadmissible as fresh complaint because: (1) it lacked promptness; (2) it was not sufficiently voluntary; and (3) the fresh complaint exception to the hearsay rule does not allow introduction of a written statement by the victim but is limited to the *testimony* of a witness concerning the victim's verbal complaint that she has been raped.

With regard to the defendant's first contention that the complaint was not prompt, it is clear that it was "part of a continuous series of complaints." *Commonwealth* v. *Howard,* 355 Mass. 526, 530. She attempted to call her mother immediately after the crimes, spoke to Cole who suggested she go to the police, conversed with two of her girl friends, spoke to her mother, and then, together with Cole and her mother, went to the police. Although the content of these conversations was not explored at the trial,[2] the inference is readily apparent that the events which took place that afternoon were discussed. In addition, the fear instilled in her by Izzo's statement that Paige would "cut . . . [her] up" and her knowledge that Izzo was still in the vicinity, having twice seen his motorcycle, could readily explain any delay in not making an immediate complaint to the police.

---

[2] The defendant took an exception to the judge's exclusion of any questions concerning the complainant's conversation with her mother. We discuss this exception later in the opinion.

In the circumstances, we are of opinion that there was no unreasonable delay in making the complaint.

Concerning the defendant's second and third contentions that the complaint was not voluntary and that it was inadmissible in written form, we discern no occasion to review the cases (see e.g. *Commonwealth* v. *Cleary*, 172 Mass. 175, 176–177; *Commonwealth* v. *Ellis*, 319 Mass. 627, 630; *Commonwealth* v. *Howard*, 355 Mass. 526, 530; *Commonwealth* v. *Hanger*, 357 Mass. 464, 466–467) involving the admission of oral evidence of fresh complaint in a rape case to confirm the general testimony of the victim. Whatever error, if any, there might have been in admitting in evidence the written statement given by this victim to the police (and we do not decide there was any such error), this victim's statements to the police were merely a summary of her oral testimony at trial. They were plainly cumulative in effect, and therefore they were not prejudicial. *Commonwealth* v. *Howard*, 355 Mass. 526, 530. It is well established that "[t]he admission of evidence that is merely cumulative of evidence already given by a witness does not commonly constitute reversible error." *Commonwealth* v. *Mannos*, 311 Mass. 94, 115, and cases cited. In the *Howard* case, *supra*, at 530, this court held that erroneously admitted statements were not prejudicial, particularly because they were cumulative of the victim's testimony. In the present circumstances, the complainant's testimony, and the clear inferences to be drawn from her conversations with her mother, her girl friends and Cole, plus the evidence of her physical condition as related by six of the Commonwealth's witnesses, all tend to corroborate the written account of the crimes. The statement added nothing of any material value to the testimony which the jury had previously heard.

The defendant's next assignment alleges error in not being allowed to cross-examine the complainant about the conversation with her mother. The defendant had asked her the following question: "Did . . . [your mother] want to know where you were?" She replied in the affirmative. Thereupon, the prosecutor stated what appeared to be an

objection: "I think this conversation between the mother and the daughter or what the mother asked her I think should have been elicited from the mother and not from this girl." The judge then said: "Well, I assume so, and inasmuch as it wasn't gone into by anybody else, I will exclude that." The only reply of the defendant was to take an exception.

Although we are satisfied that in the case before us the error was not prejudicial we believe the exception deserves some discussion. The defendant's right to show lack of fresh complaint is correlative with the Commonwealth's duty to show that such complaint was made. In *Glover* v. *Callahan*, 299 Mass. 55, 57, we said that ". . . where a female witness testifies as to a rape or similar assault upon her the mere absence of evidence of an earlier complaint discredits her. A legitimate argument against her credibility may be made solely on the basis of the absence of evidence of such a complaint." Since fresh complaint was a material issue at the trial, the defendant was entitled to elicit from either the complainant or her mother whether the complaint was actually made as well as its details.

It may well be that the defendant did not cross-examine the mother concerning the conversation as a matter of trial strategy to avoid eliciting testimony harmful to him. We think this is a fair assumption when we consider that the defendant made no effort to cross-examine other witnesses relative to their conversations with the complainant.

In any event the Commonwealth's evidence clearly tended to show that she complained to both Cole and her mother. The inferences to be drawn from their testimony are not ambiguous. After the complainant's conversation with Cole, he urged her to go to the police. Upon meeting and conversing with her mother, she, accompanied by her mother and Cole, immediately went to the police. It is a reasonable assumption that when they went to the police station that evening they did not go there to complain about receiving a parking ticket. The inference of fresh complaint seems well-nigh incontrovertible. See *Commonwealth* v. *Jones*, 354 Mass. 759.

Finally, we treat with the assignment concerning the admission of certain photographs of the defendant. In his brief, the defendant argues that the photographs "were used . . . during cross-examination of defense witnesses for the improper puipose of showing bad character by emphasizing the defendant's appearance in the photographs with special reference to the beard he was wearing, the swastikas on his motorcycle jacket, and his German helmet." At the outset, we note that no exceptions were taken to the use of the photographs in cross-examining the defendant, for which he now claims reversible error. We voice the hope that it will not be necessary for us to continually state that an assignment of error not based on an exception precludes appellate review. *Commonwealth* v. *Foley*, 358 Mass. 233, 236. In the case at bar, we treat with this assignment only because the defendant did take exceptions to the use of the photographs in cross-examining other defence witnesses.

In the direct examination of the defendant, he was asked a series of questions concerning whether the photographs were a fair representation of his appearance at the time of the alleged offences. The defendant responded in the affirmative. Prior to the trial, as a result of a conversation the defendant had with his lawyer, he shaved off his beard to give him a better appearance in court. It is apparent that he did not appear in the courtroom at the trial with the German helmet on his head and clothed in his motorcycle jacket.[3] The evidence shows that the purpose of the Commonwealth's questions and the use of the photographs was to substantiate the appearance of the defendant on the date of the alleged crimes and that the court admitted them for this purpose. "Whether such evidence was so inflammatory in nature as to outweigh its probative value and preclude its admission is a question to be determined by the trial judge in the exercise of his sound discretion." *Commonwealth* v. *D'Agostino*, 344 Mass. 276, 279. We discern no abuse of discretion and

---

[3] The transcript does not indicate whether he wore the jacket in the courtroom. We assume that he did not because the jacket was introduced as an exhibit.

we fail to see how the defendant can now claim prejudice after his admission on *direct* examination that the pictures were a fair representation of his appearance at the time of the alleged incidents. *Commonwealth* v. *Gardner*, 350 Mass. 664, 669.

*Judgments affirmed.*