COMMONWEALTH vs. RONALD E. BAILEY.

Berkshire.    April 5, 1976. — June 7, 1976.

Present: HENNESSEY, C.J., REARDON, QUIRICO, BRAUCHER, & KAPLAN, JJ.

*Evidence,* Fresh complaint, Corroborative evidence.  *Rape.   Identification.   Practice, Criminal,* Suppression of evidence, Examination of jurors.

At the trial of indictments charging rape, there was no error in permitting a policewoman to testify in detail to the victim's description of the attack given the morning after the rape as evidence of a fresh complaint.  [391-393]

Discussion of fresh complaint doctrine.  [394-397]

At a criminal trial the judge did not abuse his discretion in denying the defendant's request to suspend the trial for a voir dire on whether a card bearing the defendant's fingerprints, which had been obtained in connection with an earlier unrelated offense and was introduced for the purpose of comparing a print found at the scene of

---

the crime, should be suppressed as the product of an illegal arrest where defense counsel had available sufficient information prior to trial to have made a timely motion to suppress. [397-398]

At a criminal trial there was no abuse of discretion in the refusal of the trial judge to ask prospective jurors certain questions propounded by the defendant where the questions were not directed to revealing racial bias or any similarly indurated and pervasive prejudice. [399-400]

INDICTMENTS found and returned in the Superior Court on April 11, 1972.

The cases were tried before *Kent B. Smith,* J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*David O. Burbank* for the defendant.

*L. Jeffrey Meehan,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J.   The defendant Ronald E. Bailey was convicted in the Superior Court on indictments charging him with rape, and assault with intent to commit rape (G. L. c. 265, §§ 22, 24), and with breaking and entering a dwelling house in the night time with intent to commit a felony, making an assault on a person lawfully therein (G. L. c. 266, § 14). He was sentenced thereon to concurrent fifteen-to-twenty year terms. His convictions on two other associated indictments[1] were placed on file. He appeals under the provisions of G. L. c. 278, §§ 33A-33G, and direct review was granted by this court under G. L. c. 211A, § 10 (A).

The jury could have found the following. The victim, a retired school teacher living alone in a small house in Sheffield, Massachusetts, heard a knock on her door in the late evening of April 1, 1972. She looked through a window in the doorway and saw "a young negro fellow, rather light, with a modified Afro." Through the closed door he asked if he could use the phone; the victim refused to let him in, but said she would make a phone call for him. She could

---

[1] Charging assault and battery (G. L. c. 265, § 13A) and an unnatural and lascivious act (G. L. c. 272, § 35).

not find in the phone book the name the man mentioned. When she returned to the door, he had gone. She informed the local policeman of the incident by telephone. As the policeman cruised through the neighborhood he saw the defendant walking on the side of the road. The defendant was known to the policeman. He matched the victim's description of the man at the door. However, the policeman did not stop or speak to the defendant but continued on his patrol.

Later in the evening, after the victim had secured the house and retired to bed, she heard a sound and looked toward the door of the bedroom. In the glow of a light near a telephone in the hallway she saw the silhouette of a person resembling the man she had seen earlier. The man had entered the house by breaking a window in the rear door and releasing the latch. The victim ran toward the phone hoping, apparently, to butt the man out of the way, but he grabbed her and the two struggled. He hit her on the mouth and tied her hands behind her back with the cord from the telephone, which he had ripped from the wall. He attempted to rape her. He then carried her into the bedroom and tied her to the bed with stockings and pantyhose. The victim was unable to see her assailant because he covered her head with a plastic laundry bag. She was then beaten and raped.

The assailant left at dawn and the victim managed to get free and run to a neighbor's house. After the police and relatives were summoned, she was taken to a hospital where she repeated her story to a State policewoman (a conversation discussed below). Meantime the police searched the victim's home. The phone ripped from the wall was found in a linen closet in the bathroom and a latent fingerprint was lifted from it. Three police officers testified at trial that the print had eighteen points of comparison with a record print of the right thumb of the defendant.[2]

---

[2] There was testimony that twelve points of comparison were adequate to establish an absolute identification.

The defendant's fingerprint expert questioned the procedures used by the police and whether some points of comparison had been estab-

A grand jury soon indicted the defendant for the crimes mentioned, but the defendant had left the Sheffield area and was not apprehended until two years later in Pennsylvania. He testified at trial, in November of 1974, that he was playing with a band in Poughkeepsie, New York, on the night of the rape, but was unable to locate witnesses who could verify this alibi, which was substantially different from one he gave a State trooper in an interview just after the rape. On cross-examination the defendant explained his failure to mention the Poughkeepsie job to the trooper by claiming that he felt the Massachusetts police would only be interested in his activities in Massachusetts.

Questions are raised on this appeal about the "fresh complaint" doctrine, the time for claiming a voir dire to suppress the record print, and the questioning of jurors for bias. We find no error.

1. The State policewoman, who visited the victim in the hospital on the morning after the rape, was allowed, over objection, to testify to the victim's description of the attack. The court admitted the testimony under the doctrine of "fresh complaint."

Ordinarily an out-of-court statement that is merely repetitive of a victim's trial testimony is not admissible as part of the case-in-chief.[3] See *Commonwealth* v. *Zukoski,*

---

lished. But he had not examined the prints for more than ten minutes before testifying, and he declined to state that the latent print was not the defendant's.

[3] A prior statement of a witness concerning a material fact that is consistent with his testimony at trial may be admitted on redirect in limited circumstances: to rehabilitate him after impeachment on a claim that his testimony is a recent contrivance or the product of animus or bias. See *Commonwealth* v. *Zukoski, ante,* 23, 26-27 (1976); *Commonwealth* v. *Heffernan,* 350 Mass. 48, 51-52, cert. denied, 384 U.S. 960 (1966); W.B. Leach & P.J. Liacos, Massachusetts Evidence 131 (4th ed. 1967). See generally Thomas, Rehabilitating the Impeached Witness with Consistent Statements, 32 Mo. L. Rev. 472 (1967). Some courts admit prior consistent statements to rebut a showing that an inconsistent statement was made. See, e.g., *Felice* v. *Long Island R.R.,* 426 F.2d 192, 197-198 (2d Cir.), cert. denied, 400 U.S. 820 (1970) (Friendly, J.); 4 J. Wigmore, Evidence § 1126, at 260-262 & n.3 (Chadbourn rev. 1972) (favoring rule and citing cases). But see *Common-*

*ante,* 23, 26 (1976); W.B. Leach & P.J. Liacos, Massachusetts Evidence 131, 183-187 (4th ed. 1967). In cases of rape, however, testimony reporting statements made by the victim shortly after the attack are universally admitted to corroborate the victim's testimony. See *Commonwealth* v. *Hanger,* 357 Mass. 464, 466 (1970); *Commonwealth* v. *Ellis,* 319 Mass. 627, 629 (1946); 4 J. Wigmore, Evidence §§ 1134-1140 (Chadbourn rev. 1972); 65 Am. Jur. 2d Rape §§ 76-81 (1972). It is said to be the more common view that the prosecution is allowed to introduce only the fact of the complaint (see, e.g., *State* v. *Grady,* 183 N.W.2d 707, 712-719 [Iowa 1971]; 4 J. Wigmore, *supra* § 1136, at 307, 307-310 n.1), but in the Commonwealth and a few other jurisdictions the rule is settled that "the whole of the statement..., including the details, is admissible." *Glover* v. *Callahan,* 299 Mass. 55, 58 (1937); see *Commonwealth* v. *Hanger, supra; Commonwealth* v. *Ellis, supra; State* v. *Purvis,* 157 Conn. 198, 207-208 (1968); *State* v. *Crissman,* 60 Ohio Op. 2d 279, 281 (County Ct. App. 1971); *Dunn* v. *State,* 45 Ohio St. 249, 251 (1887).[4]

A fresh complaint doctrine is justified on the ground that a victim's failure to make prompt complaint might be viewed by the jury as inconsistent with the charge of sexual assault (see *Commonwealth* v. *Spare,* 353 Mass. 263, 265 [1967]), and in the absence of evidence of complaint the jury might assume that none was made. See *Glover* v. *Callahan, supra* at 57; 4 J. Wigmore, *supra* § 1135, at 298-299. The defendant argues that although this explanation can justify admission of the fact of the complaint, it does not justify admission of the details. Cf. K.B. Hughes, Evi-

*wealth* v. *Zukoski, supra* at 26-28.

As to the special situation of eyewitness identifications, see *Commonwealth* v. *Locke,* 335 Mass. 106, 112 (1956); McCormick, Evidence § 251, at 603 (2d ed. 1972).

[4] As to problems arising when the defendant is chargd with other crimes in addition to rape, and the fresh complaint encompasses them all, see *Commonwealth* v. *Blow, post,* 401 (1976), decided this day. In fact this is the situation in the present case, but the defendant makes no special point of it.

dence § 244, at 296-297 n.98 (1961); 4 J. Wigmore, *supra* § 1136, at 306-307. So he contends we should modify our rule by limiting the proof to the fact of complaint.

We may say, preliminarily, that, even if we accepted the defendant's argument, we would conclude that the admission of the policewoman's testimony, with its detail, was nonprejudicial and harmless in the present case. Both the neighbor, to whose home the victim retreated, and the victim's sister were allowed to testify, without objection, to what the victim told them following the attack. And the testimony of the policewoman was merely a short summary of the testimony the victim herself gave about the criminal events. See *Commonwealth* v. *Izzo,* 359 Mass. 39, 43 (1971); *Commonwealth* v. *Howard,* 355 Mass. 526, 530 (1969). It contained no new information. It did not reach substantially any contested factual question, for the issue in dispute at the trial was the identity of the attacker, and the testimony of the policewoman did not include a description of him. Also, we think it fanciful to suppose that the policewoman's testimony could have served to inflame the jury; it was a dry recounting of the facts, and such force as it might have was diminished by the circumstance that the policewoman was unable to recall the physical appearance of the badly beaten victim. In short, the testimony was a noncontroversial, largely inconspicuous, and redundant segment of the trial.[5]

---

[5] In *Commonwealth* v. *Spare,* 353 Mass. 263 (1967), we found reversible error in the admission of testimony by a doctor as to what the complainant told him on the morning after an alleged rape. The judge admitted the testimony, over a general objection, without considering whether the complaint was sufficiently prompt to be "fresh," and without limiting use of the testimony by the jury to the corroborative purpose (cf. n.11 below). The testimony might have affected the jury because there was a suggestion of consent by the complainant. The trial in *Spare* was infected by other error: cross-examination of the defendant was allowed with regard to an offense of which he had not been convicted and which had no bearing on his guilt of rape. For a case closer to the present, see *Commonwealth* v. *Izzo,* 359 Mass. 39, 43 (1971).

Commonwealth *v.* Bailey.

We are not persuaded, however, that we should depart from our settled practice.[6] Whatever may have been the historical origin of the fresh complaint doctrine,[7] it should now be seen in relation to the common observation, supported by some empirical data,[8] that juries tend toward considerable and perhaps inordinate skepticism in rape cases, above all where there is a suggestion of willingness or acquiescence on the part of the victim. As noted, admission of testimony of fresh complaint anticipates to some extent the inference of consent, or of merely imagined assault. However, the so called "majority" rule[9] permits only the following: "On the direct examination the practice has been merely to ask whether she made complaint that such an outrage had been perpetrated upon her, and to receive in answer only a simple yes or no." *Woods* v. *State,* 233 Ind. 320, 326 (1954), quoting from *Thompson* v. *State,* 38 Ind. 39, 40 (1871). It may be doubted whether so perfunctory a reference goes far enough to achieve the intrinsic purpose of the doctrine.

---

[6] The defendant's argument is not strengthened by being cast in terms of equal protection — that our rule of fresh complaint discriminates against those charged with sex crimes. As our text indicates, the challenged rule rationally furthers a legitimate State purpose. Cf. *Commonwealth* v. *McQuoid,* 369 Mass. 925, 927-928 (1976).

[7] The doctrine of fresh complaint has been traced back to the primitive requirement that the victim of any crime of violence make hue and cry to arouse the neighborhood. See Holmes, J., in *Commonwealth* v. *Cleary,* 172 Mass. 175, 176 (1898); 2 F. Pollock & F. Maitland, The History of English Law Before the Time of Edward I 578-579 (2d ed. 1959); 6 J. Wigmore, Evidence § 1760 (3d ed. 1940). Fresh complaint in cases of sexual crime evolved into a hearsay exception, and was finally rationalized on a basis of corroboration.

[8] The University of Chicago Law School jury study revealed that in cases of "simple rape" — single assailant, no evidence of violence, victim and defendant not strangers — a jury convicted defendants in three of forty-two cases, whereas the judge would have convicted in twenty-two cases. H. Kalven, Jr., & H. Zeisel, The American Jury 249-254 (1966); see *People* v. *Rincon-Pineda,* 14 Cal. 3d 864, 879-882 (1975); Note, The Rape Corroboration Requirement: Repeal Not Reform, 81 Yale L.J. 1365, 1378-1382 (1972). This disparity between jury and judge in rape cases appears greater than in other crimes.

[9] When the jurisdictions following the "res gestae" route (see n.12 below) are taken into account, the practical "majority" dwindles, if it exists at all.

The English court which, after extended consideration, overturned the previous rule confining the corroborative testimony to the fact of the complaint, and decided to admit the details, added the following thoughts: "The jury, and they only, are the persons to be satisfied whether the woman's conduct was so consistent or not [i.e., consistent with her testimony]. Without proof of her condition, demeanour, and verbal expressions, all of which are of vital importance in the consideration of that question, how is it possible for them satisfactorily to determine it? Is it to be left to the witness to whom the statement is made to determine and report to the jury whether what the woman said amounted to a real complaint? And are the jury bound to accept the witness's interpretation of her words as binding upon them without having the whole statement before them, and without having the power to require it to be disclosed to them, even though they may feel it essential to enable them to form a reliable opinion? . . .

"In reality, affirmative answers to such stereotyped questions as these, 'Did the prosecutrix make a complaint' (a very leading question, by the way) 'of something done to herself?' 'Did she mention a name?' amount to nothing to which any weight ought to be attached; they tend rather to embarrass than assist a thoughtful jury, for they are consistent either with there having been a complaint or no complaint of the prisoner's conduct. To limit the evidence of the complaint to such questions and answers is to ask the jury to draw important inferences from imperfect materials, perfect materials being at hand and in the cognizance of the witness in the box. In our opinion, nothing ought unnecessarily to be left to speculation or surmise." Hawkins, J., in *The Queen* v. *Lillyman,* [1896] 2 Q.B. 167, 177-178 (cited in *Glover* v. *Callahan, supra,* 299 Mass. at 58). See also R. Cross, Evidence 209-215 (4th ed. 1974); 6 J. Wigmore, Evidence § 1760, at 172 (3d ed. 1940).[10]

---

[10] Canadian courts follow the English example and admit the details of the complaint. See *Thomas* v. *The Queen,* [1952] 4 D.L.R. 306 (Can. Sup. Ct.); *The King* v. *Ashley,* [1944] 4 D.L.R. 634 (Prince Edward Island Sup. Ct.).

Our rule does not involve an unfair loading of the case against the defendant. He is entitled to have it impressed on the jury that the testimony may be used for corroborative purposes only; it cannot be used as hearsay to fill gaps in the prosecution's case.[11] Usually it will be merely repetitive of the victim's testimony at the trial (see *Commonwealth* v. *Izzo,* 359 Mass. 39, 43 [1971]; *Commonwealth* v. *Howard,* 355 Mass. 526, 530 [1969]); if the testimony about the complaint does differ from the victim's own testimony, then the rule admitting details might provide a marginal advantage to the defendant, since he could use the discrepancy to discredit the victim. See *State* v. *Kinney,* 44 Conn. 153, 156 (1876).

In those jurisdictions which reject the details, it remains the law that, once the victim's testimony has been explicitly impeached by the defendant as motivated by bias or as a recent contrivance, the prosecution may introduce the complaint, including the details, for purposes of rehabilitation. See 4 J. Wigmore, *supra* §§ 1137-1138, 1140; note 3 *supra.*[12] If the details are admitted when there is explicit impeachment, it is not a large or illogical step to admit them when impeachment would be implied from failure to show that there was prompt complaint. And we note the likelihood that the details would be admitted in any event in trials in which the complaint might have some significant bearing on the outcome — cases where consent or the like is suggested — because the defendant might seek to impeach the victim's testimony on grounds that would allow the details of the complaint to come in on rebuttal for rehabilitation. Our rule shifts the time of introduction.

---

[11] The jury were not so instructed in the present case, but the defendant did not object to the charge or attempt to raise the issue on appeal. See *Commonwealth* v. *Smith,* 342 Mass. 180, 188 (1961); *Commonwealth* v. *Shea,* 323 Mass. 406, 416 (1948).

[12] Many jurisdictions admit the detailed complaint, and without limitation to a corroborative purpose, if it is made close enough to the rape to constitute part of the "res gestae." See *Hooks* v. *State,* 215 Ga. 869, 871-872 (1960); *People* v. *Dery,* 74 Ill. App. 2d 112, 119 (1966); *Duncan* v. *State,* 170 Tex. Crim. 132, 134 (1960); Annot., 19 A.L.R.2d 579 (1951).

The present trend is to modify the rules of evidence in the trials of sexual assault so as to provide fair protection for the rape victim. See, e.g., Note, California Rape Evidence Reform: An Analysis of Senate Bill 1678, 26 Hastings L.J. 1551 (1975); Note, Rape Reform Legislation: Is it the Solution?, 24 Clev. St. L. Rev. 463 (1975). All too often the already traumatized victim has found herself subjected to inquiry at trial that has made her the target of ridicule. Our fresh complaint rule tends more satisfactorily than the rival rule to meet in proper cases the humiliating intimation that the victim agreed to the attack or dreamt it up.

We should add that when it appears that admission of details would operate unjustly — as by inciting a jury through a needless rehearsal of the particulars of a gruesome crime — the judge may well limit the testimony in his discretion.

2. The prosecution introduced a card on which the defendant's fingerprints had been recorded; with this, the latent print found on the telephone was compared, providing the telling piece of identification evidence in the case. The record print had been taken in 1971 upon the arrest of the defendant for drunkenness, for disturbing the peace, and for assault and battery; he had been convicted in a District Court, apparently after waiving counsel, and was fined a total of $60. He did not appeal the convictions.

Counsel for the defendant objected to the introduction of the record print and sought a voir dire in the midst of trial to determine whether the print should be suppressed as the product of an illegal arrest. See *Davis* v. *Mississippi,* 394 U.S. 721 (1969). Counsel had no information to suggest that the 1971 arrest was improper, but was of the view that, once the point was raised, the Commonwealth had the burden of showing that the arrest was legal. Cf. *Commonwealth* v. *Antobenedetto,* 366 Mass. 51, 56-57 (1974) (burden on prosecution to establish reasonableness of warrantless search). We conclude that the defendant's efforts to suppress the record print were not timely and that it was properly admitted.

Rule 101B of the Superior Court (1954) (now Rule 61 [1974]) provided in part: "[Motions to suppress] shall be filed within ten days after a plea of not guilty ... or within such further time in advance of trial as the court may order, unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion, but the court in its discretion may entertain such motions at any time or at the trial.

"The court need not hear any motion which does not comply with this Rule."

Here, as a colloquy with the judge reveals, the defendant's counsel was aware from the "second or third day" of his involvement in the case that fingerprint evidence would be presented and he was allowed full access to the prosecution's fingerprint evidence before trial. Although the record print was not dated and thus did not itself reveal that it had been made before the arrest of the defendant on the present charges, counsel indicated he was aware of a record print that antedated that arrest: he knew of testimony before the grand jury in 1972 comparing the latent print with a record print. Counsel also acknowledged that he knew the defendant was "involved in some other incident" — he had indeed represented a codefendant — which suggested that he knew the defendant had been previously arrested, booked, and fingerprinted. All this indicates — quite apart from what counsel could learn by questioning his client directly — that counsel had available sufficient information before trial to have made a timely motion to suppress. See *Commonwealth* v. *Stanley,* 363 Mass. 102, 104 (1973); *Commonwealth* v. *Moore,* 359 Mass. 509, 512 (1971).

There is no demonstration that the trial judge abused his discretion in refusing on the defendant's motion to suspend the trial and entertain a voir dire. The allowance of the motion without warning might well have left the prosecution disabled to muster the evidence on the prior arrest or to take steps to obviate the necessity for such proof by securing new prints. See *Davis* v. *Mississippi,* 394 U.S. 721, 725-726 n.4 (1969); *id.* at 730 (Stewart, J., dissenting).

Commonwealth v. Bailey.

3. The judge put to prospective jurors certain of the questions requested by the defendant's counsel to search out bias,[13] but he refused some others, and reversible error is claimed on that account. The questions in issue were in substance: whether the potential jurors had worked for a law enforcement agency, had friends or relations who were policemen, or had greater trust in the testimony of police than of others; whether they had been directly or vicariously victimized by crime; whether they would be affected in their determination of guilt or innocence by the fact that the charge was rape rather than some other crime; and whether they could return a not guilty verdict if the prosecution's proof indicated the probable culpability of the defendant, but did not meet the reasonable doubt standard.

Denial of these questions at voir dire plainly did not amount to constitutional error as they were not directed to revealing racial bias or any similarly indurated and pervasive prejudice. See *Commonwealth* v. *Harrison,* 368 Mass. 366, 371-374 (1975). Indeed, even within the category of racial prejudice, the Supreme Court has recently held in *Ristaino* v. *Ross,* 424 U.S. 589 (1976),[14] that the situation must be particularly exacerbated before specific questions directed to race are required to be put as a matter of constitutional right.

As the defendant points out, some Federal precedent can be mustered for the proposition that the failure to ask

---

[13] The jurors were asked, among other things, whether they would be affected by the fact that the defendant was black and the alleged victim white. The jurors were questioned individually, with follow-up when appropriate. The questioning on racial prejudice met or exceeded the standards set by the First Circuit in *Ross* v. *Ristaino,* 508 F.2d 754, 757 (1st Cir. 1974), rev'd, 424 U.S. 589 (1976). See n.14 below.

[14] In *Ristaino,* the Supreme Court in effect upheld this court's refusal to reverse Ross's conviction for omission to probe further into racial bias in the questioning of jurors. For the history of the case, see *Commonwealth* v. *Ross,* 361 Mass. 665 (1972), cert. granted and case remanded for consideration in the light of *Ham* v. *South Carolina* (409 U.S. 524 [1973]), 410 U.S. 901, judgment aff'd on remand, 363 Mass. 665, cert. denied, 414 U.S. 1080 (1973) (with dissents). Habeas corpus was granted in *Ross* v. *Ristaino,* 508 F.2d 754 (1st Cir. 1974), cert. granted, 421 U.S. 987 (1975), judgment rev'd, *Ristaino* v. *Ross,* 424 U.S. 589 (1976).

questions similar to some of those requested by the defendant would be an abuse of discretion. As to the question about giving greater credence to police officers than other witnesses, see *Brown* v. *United States,* 338 F.2d 543, 544 (D.C. Cir. 1964) (Burger, J., while a member of the Court of Appeals), but see *Gorin* v. *United States,* 313 F.2d 641, 647 (1st Cir.), cert. denied, 374 U.S. 829 (1963). As to prior experience as a victim of crime, see *United States* v. *Poole,* 450 F.2d 1082 (3d Cir. 1971). As to willingness to apply the appropriate standard of proof, see *United States* v. *Blount,* 479 F.2d 650, 651-652 (6th Cir. 1973), but see *United States* v. *Wooten,* 518 F.2d 943, 946-947 (3d Cir.), cert. denied, 423 U.S. 895 (1975); *United States* v. *Crawford,* 444 F.2d 1404 (10th Cir.), cert. denied, 404 U.S. 855 (1971). We have traditionally allowed the trial judge wide latitude in deciding how deep to probe with questions of these sorts in the quest for an unbiased jury. See *Commonwealth* v. *Harrison, supra* at 371; *Commonwealth* v. *Nassar,* 354 Mass. 249, 252-254 (1968); *Commonwealth* v. *Subilosky,* 352 Mass. 153, 158 (1967). Upon consideration of the facts of the present case, we conclude that there is no proper basis for overriding the exercise of discretion by the trial judge on the scene.

Of course this is not to say that it necessarily would have been wrong or unwise for the judge to put questions on some, at least, of the lines requested. On this problem of particularizing the inquiries into possible bias, we spoke in *Commonwealth* v. *Ross,* 363 Mass. 665, 673-674 (1973) (see note 14 *supra*); and see G. L. c. 234, § 28, as amended through St. 1975, c. 335.

*Judgments affirmed.*