COMMONWEALTH *vs.* JOHN F. McCARTHY.

Middlesex.    September 9, 1981. — December 7, 1981.

Present: HALE, C.J., GOODMAN, & GRANT, JJ.

*Practice, Criminal,* Assistance of counsel. *Evidence,* Fresh complaint.

There was no basis for a criminal defendant's contention on motion for
   a new trial and on appeal that trial counsel's preparation constituted
   ineffective assistance of counsel, especially in light of the defendant's
   failure to show that further investigation would have uncovered any-
   thing which would have significantly helped his cause. [724-725]
Certain tactics of counsel at the trial of an indictment charging rape,
   including his failure to call two witnesses to testify to the defendant's
   reputation as "not being a violent and sexually assaultive person" and
   his failure to move for a continuance when the defendant's companion
   on the night in question was unexpectedly ordered to testify did not
   constitute ineffective assistance of counsel. [725-727]
At the trial of an indictment charging rape, defense counsel's failure to
   object to references to the defendant as "John the Reptile" in the fresh
   complaint to which the victim's brother-in-law, sister, and two police-
   men testified did not constitute ineffective assistance of counsel.
   [727-729]

INDICTMENT found and returned in the Superior Court
Department on October 10, 1978.

The case was tried before *Fine,* J., and a motion for a
new trial was heard by her.

*John C. Ottenberg* for the defendant.

*Susan C. Mormino,* Assistant District Attorney, for the
Commonwealth.

GOODMAN, J.  The defendant appeals from his conviction
of rape and from the denial of his motion for a new trial.
The motion for a new trial was brought by present counsel
appointed after trial; he argues that trial counsel had pre-
pared the case inadequately and tried it in a perfunctory
manner.  Our examination of the entire record before us

convinces us that, on the contrary, trial counsel's perform-ance was well "within the range of competence demanded of attorneys in criminal cases." *McMann* v. *Richardson*, 397 U.S. 759, 771 (1970), quoted in *Commonwealth* v. *Adams*, 374 Mass. 722, 728 (1978). We find no indication that there was "behavior of counsel falling measurably below that which might be expected from an ordinary falli-ble lawyer." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). Nor does present counsel show us how "better work might have accomplished something material for the de-fense." *Commonwealth* v. *Adams*, 374 Mass. at 727, quot-ing *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977). *Cepulonis* v. *Commonwealth*, 384 Mass. 495, 502 (1981).

It is not disputed, nor can it be, that the victim was raped and badly beaten during the early morning hours of May 11, 1978, in Fort Hill Park in Lowell. The only real ques-tion at trial was whether the defendant had committed the acts. Both the victim and the defendant, who testified in his own behalf, agree in large part on the events preceding the attack: the defendant and his friend, Anthony Du-charme, were riding in the defendant's car when they saw the victim standing outside a bar in Lowell at about 2:15 A.M. They invited her to take a ride with them; she did not know the defendant but she did know Ducharme. She got into the car in the front between the two men, and the three proceeded on their ride. They made a few stops — for gas, to pick up a hitchhiker and drop her off, and for oil. They then drove to the top of Fort Hill Park, an area known as "lover's lane." The victim testified that when the defend-ant tried to kiss her and asked her if she wanted to make a quick $100,[1] she left the automobile and proceeded down the hill on foot. The defendant overtook her in his auto-mobile and asked her to get back in the car. She refused and kept walking, and the defendant drove off out of the

---

[1] The defendant testified that he asked her if she had been standing down there "trying to get picked up."

victim's sight. About five minutes later, as she testified, the attack occurred; someone came up behind her, pulled her jacket off and put it over her head, knocked her to the ground and raped her, all the while hitting her in the face and telling her not to remove the jacket. She was brutally beaten and hospitalized for about eight days. The victim could not see her attacker but identified his voice as the defendant's. She also heard another voice which she recognized as Ducharme's say, "Let her alone, that's enough." The defendant denied that he had raped the victim and testified that after stopping to ask her into the automobile he had gone directly home. The victim's account was generally confirmed by Ducharme.

The victim made her way to an apartment near the park and asked for help; her sister and brother-in-law were called. Her sister testified that the victim told her, "You know who did this to me . . . Tony, Roseanne's boyfriend, and John the Reptile." (The victim had testified that the defendant had told her he was known by this name.) Defense counsel on cross-examination of the victim's brother-in-law elicited that he also heard the victim say, "It was Tony and a man by the name of John" whom she referred to as "John the Reptile." Other evidence and details of the proceedings will be discussed in connection with the various contentions raised by present counsel.

1. There is no basis for the defendant's contention here and at the hearing on the motion for a new trial that trial counsel's preparation constituted ineffective assistance of counsel. The trial judge, who also heard the motion for a new trial, found that trial counsel "requested and received all police reports and medical records. He conducted two office interviews with the defendant prior to trial and discussed the case with the defendant on several occasions by telephone. Through counsel he also interviewed the defendant's companion on the night in question . . . . He also chatted about the case prior to trial on a number of occasions with Sally McDonald, the defendant's girlfriend, with

whom the defendant lived."[2] Further, trial counsel represented the defendant at the probable cause hearing in the Lowell District Court, where the victim testified, and at the arraignment in the Superior Court. See *Commonwealth* v. *Saferian*, 366 Mass. at 94; *Delle Chiaie* v. *Commonwealth*, 367 Mass. 527, 537 (1975). Nor does present counsel, who presumably made his own investigation, show that further investigation would have uncovered anything which would have significantly helped the defendant's cause.

Present counsel, at the hearing on the motion for a new trial, did produce two witnesses who were longtime friends of the defendant and would have testified that the defendant had a reputation as "not being a violent and sexually assaultive person and rather . . . [as a] gentle person." Also, they would both have testified that they had never heard him called "John the Reptile."

The trial judge, in her findings on the motion for a new trial, held "that the evidence of the defendant's guilt was very strong." In the circumstances we agree with the trial judge's assessment that the proposed testimony of the two witnesses would not "have had any likely effect on the jury's verdict." Failure to produce it did not "likely deprive[ ] the defendant of an otherwise available substantial ground of defense." *Commonwealth* v. *Saferian*, 366 Mass. at 96. It seems inconceivable that such testimony, "muted and colorless" as it generally is (McCormick, Evidence § 191, at 456 [2d ed. 1972]), would have altered the jury's decision to believe the victim rather than the defendant. That trial counsel "failed to call an additional witness . . . to bolster the defense" does not establish counsel's ineffectiveness. *Commonwealth* v. *Rondeau*, 378 Mass. 408, 413 (1979). Indeed, the introduction of reputation evidence might have

---

[2] Present counsel does not here argue, as he argued on the motion for a new trial, that trial counsel should have called Sally McDonald as a witness. From the findings on the motion it appears that such a tactical decision by trial counsel did not indicate inadequacy. See *Commonwealth* v. *Sellon*, 380 Mass. 220, 225-226 (1980).

been counterproductive, and this possibility might well have influenced trial counsel's tactical decision that such testimony should not be introduced. See *Commonwealth* v. *Sellon*, 380 Mass. 220, 225-226 (1980); *Commonwealth* v. *Stokes*, 10 Mass. App. Ct. 434, 436-437 (1980). From aught that present counsel has showed us, it does not appear that trial counsel did not reasonably fear to open a Pandora's box. A decision in a case of this kind not to introduce reputation evidence was nothing but a tactical choice which was not "manifestly unreasonable." *Commonwealth* v. *Adams*, 374 Mass. at 728, 730. *Commonwealth* v. *Rondeau*, 378 Mass. at 413. *Commonwealth* v. *Sellon*, 380 Mass. at 223-226.

Present counsel also claims that trial counsel should have asked for a continuance further to investigate Ducharme when, to the surprise of trial counsel — and probably to the surprise of Ducharme himself — he was ordered, late in the trial, to testify although he had consistently refused to testify both at the arraignment and at the probable cause hearing. The order of the trial judge and the prosecution's promise not to prosecute put a different light on the matter, and Ducharme agreed to testify.[3] Trial counsel was thus faced with the dilemma of proceeding or asking for a continuance. He chose to proceed, and we will not fault him in this regard. He had already interviewed Ducharme and may well have made the choice to continue rather than give Ducharme an opportunity to think over his testimony. The decision to go ahead was purely tactical and certainly not "manifestly unreasonable."

Indeed, trial counsel's cross-examination indicates that he knew a great deal about Ducharme. He elicited that Ducharme was married and had two small children, which raised the stakes that he had in not being involved in the criminal acts. Trial counsel was also able to elicit testimony that Ducharme's memory was hazy, that he was intoxicated, that he kept falling asleep in the back seat of the car,

---

[3] He was the last witness for the prosecution.

and that he could not identify the victim when he saw her on the ground.[4] In addition, he elicited from Ducharme that a stereo was playing loudly the entire time the group was in the car. He also received and brought to the jury's attention a stipulation from the prosecution that Ducharme had been promised that he would not be prosecuted, though Ducharme had denied on cross-examination that he had received any such promise. Nor does present counsel tell us concretely what could have been accomplished by further investigation. His contention that trial counsel could have moved for the witness's criminal records is also abstract. "We look at the question of assistance of counsel as a practical not an abstract matter." *Commonwealth* v. *Saferian,* 366 Mass. at 98. Present counsel did not produce any criminal record which might have aided the defense; he did not dispute trial counsel's testimony that Ducharme "had some criminal record but not substantial." There is nothing to indicate that Ducharme's criminal record, if admissible at all, would have impugned Ducharme's credibility sufficiently to make his testimony valueless.

2. Present counsel's argument that the trial was conducted in a perfunctory manner is baseless. He complains first that no exceptions[5] were taken by trial counsel but points specifically to only two occasions on which, he argues, the failure to take exceptions would have prejudiced the defendant. The victim testified that the only name the defendant gave her was "John the Reptile." Defendant's present counsel does not argue that this admission by the defendant was inadmissible. Compare *Commonwealth* v. *Clark,* 3 Mass. App. Ct. 481, 486 (1975); *Commonwealth* v. *Wood,* 7 Mass. App. Ct. 455, 459 (1979), *S.C.* 380 Mass. 545, 551 (1980). He argues, however, that its repetition in

---

[4] He stated: "My mind draws a blank to what was lying on the ground."

[5] The defendant did make a number of objections, some of which were allowed. The case was tried in January, 1977, before the effective date of the Massachusetts Rules of Criminal Procedure. See Mass.R.Crim.P. 1A(3), 378 Mass. 843 (1979).

the fresh complaint to which the victim's brother-in-law, sister, and two policemen testified should not have been admitted. In this Commonwealth "the rule is settled that 'the whole of the statement . . ., including the details, is admissible.'" *Commonwealth* v. *Bailey*, 370 Mass. 388, 392 (1976), quoting *Glover* v. *Callahan*, 299 Mass. 55, 58 (1937). In *Bailey* the court reconsidered and confirmed this rule and further held that "when it appears that admission of details would operate unjustly — as by inciting a jury through a needless rehearsal of the particulars of a gruesome crime — the judge may well limit the testimony in his discretion." *Commonwealth* v. *Bailey*, 370 Mass. at 397. The trial judge in her memorandum indicated that she would have admitted the name "as part of the fresh complaint." This would have been far from an improper exercise of discretion. The name does not appear to us — or apparently to the trial judge — as horrendous as it appears to present counsel. Nor does the name itself loom large in the case. Beyond the victim's testimony that this was the name the defendant gave her and the fresh complaint in which she used the name as the only one known to her, it did not figure in the trial except to differentiate the defendant from Ducharme. Further, present counsel does not object to this testimony of the victim, and the jury would, in any event, naturally view the fresh complaint as merely corroborative. Cf. *Commonwealth* v. *Denault*, 362 Mass. 564, 567 (1972); *Commonwealth* v. *Repoza*, 382 Mass. 119, 130 (1980). Thus, though the defendant was entitled to an instruction, if requested, that the fresh complaint was merely to be used for corroboration (*Commonwealth* v. *Bailey*, 370 Mass. at 396), the failure to ask for such an instruction was "nonprejudicial and harmless." *Bailey, supra* at 393.

Moreover, trial counsel apparently took a different view of the significance of the use of the name. His tactic was primarily to emphasize on cross-examination that the victim had told her sister and the police that two men — Ducharme and "John the Reptile" — rather than one had raped her. Marshalling bits and pieces from the testimony,

including cross-examination of the victim[6] and Ducharme (whose cross-examination we have discussed), trial counsel argued that the victim was confused in her voice identification, the weakest part of the case, and that Ducharme could not be believed because of his intoxicated condition. This tactic — and it was not "manifestly unreasonable" — was obviously inconsistent with any request for an instruction that the fresh complaint testimony could be used only for corroboration. Such an instruction would have weakened the fresh complaint testimony on which the defendant relied in developing his theory in his closing argument. As we have indicated, trial counsel's tactics were properly pointed at the main chance. Nor, as the trial judge points out, does present counsel indicate any line of examination which might have been more fruitful. We emphasize that we are not persuaded by abstract contentions which can be gleaned by hindsight from a transcript and which do not show exactly how "better work might have accomplished something material for the defense." *Commonwealth* v. *Satterfield*, 373 Mass. at 115.

Thus, we see no substantial risk of a miscarriage of justice or inadequacy of trial counsel in this case. See *Commonwealth* v. *Rondeau*, 378 Mass. at 413-414, *Commonwealth* v. *Brown*, 9 Mass. App. Ct. 609, 611 (1980). As we analyze the transcript, the case was well tried, and trial counsel did as well as could be expected with the strong case against the defendant.

*Judgment affirmed.*

*Order denying motion for a new trial affirmed.*

---

[6] The victim testified that the car drove out of sight but that she was grabbed from behind only a few minutes later. The area was in complete darkness, and she never saw the face of the attacker.