COMMONWEALTH *vs.* JAMES FOSKETTE, JR.
(and five companion cases[1]).

No. 90-P-460.

Worcester. January 8, 1991. - March 29, 1991.

Present: WARNER, C.J., KAPLAN, & PORADA, JJ.

*Rape. Indecent Assault and Battery. Practice, Criminal,* Duplicative convictions. *Evidence,* Fresh complaint.

At the trial of indictments against two defendants for aggravated rape, indecent assault and battery on a person over fourteen, and rape of a child, the judge properly admitted fresh complaint testimony and submitted the issue of "freshness" to the jury with appropriate instructions. [390-391]

At the trial of indictments against two defendants for aggravated rape, indecent assault and battery on a person over fourteen, and rape of a child, the indecent assault and battery was held to be a lesser included offense of the aggravated rape and the judgments of conviction were vacated; however, in the circumstances, the offense of rape of a child was held not to be a lesser included offense of the aggravated rape. [391-392]

INDICTMENTS found and returned in the Superior Court Department on April 6, 1989.

The cases were tried before *James P. Donohue,* J.

*Patricia A. O'Neill,* Committee for Public Counsel Services, for James Foskette, Jr.

*James A. Couture* for John Koneczny.

*Lynn Morrill Turcotte,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J. The defendants Foskette and Koneczny appeal from judgments of conviction entered upon jury verdicts after a joint trial finding each of them guilty of the crimes of

---

[1]Two of the companion cases are against the same defendant. The other three are against John Koneczny.

aggravated rape (G. L. c. 265, § 22[a]), indecent assault
and battery on a person who has attained the age of fourteen
years (G. L. c. 265, § 13H), and rape of a child (G. L.
c. 265, § 23). They argue that the trial judge committed er-
ror, requiring reversal of the convictions, in admitting against
them evidence of "fresh complaint" by the complaining wit-
ness. They argue also, although the point was not made at
trial, that the crimes are so far overlapping that at all events
the two last mentioned judgments must be vacated. We hold
that there was no error in the admission of the evidence, but
that the judgment in each case for indecent assault and bat-
tery should be vacated as duplicative, leaving the judgments
for aggravated rape and rape of a child (sometimes called
"statutory" rape).

We describe the evidence in some detail in order to furnish
a background and basis for reviewing the judge's action in
respect to the issue of fresh complaint.

The complainant, Susan (names are fictitious), fifteen
years old at the date of the criminal episode, sixteen at the
time of trial, was the first witness for the Commonwealth and
testified to happenings from 6:30 A.M., Friday, September 23,
1988, when her mother waked her to go to school. She had
decided on Thursday that she would not go.[2]

She rose at 9:00 and, after 12:00, walked about the vicin-
ity of her hometown of Webster until time to call her friend
Betty in Oxford, that is, after Betty would have returned
from school around 2:00 P.M. She reached Betty by telephone
and they arranged to meet in Oxford at a pizza parlor, called
Dairy Express, a hangout for teenagers. Susan hitched a ride
to Oxford. At Dairy Express Susan and Betty encountered
the defendants, Foskette and Koneczny, Foskette's girlfriend
Hannah, and another teenager named Mary. Susan was
friendly with these people; she had known the two young
men for about seven months.

Susan remained at Dairy Express until it was getting dark.
She left with Betty and Mary. They went to Devil's Path,

---

[2]Susan was enrolled at a "Project Coffee" in Oxford. She said it was a
school for kids who didn't want to go to school.

another hangout in nearby woods. There she and others drank from a mixture of Mountain Dew and Southern Comfort that someone had brought, but she said she wasn't feeling it. Ernest was in the group. Betty left, then Susan and Mary hitched a ride to Oxford center. They dropped in at Dairy Express, then Mary left. It was well into the evening. At the center, Susan ran into the defendants and another boy, George Gagliastre. She left the group to telephone a friend and ask whether babysitting was needed, but no one answered. Returning, Susan playfully ripped George's already torn pants at the knee, and George or one of the others ripped her shirt down the middle. She buttoned her jacket.

Koneczny after a while asked whether she wanted to take a walk and beat up on a jeep owned by a fellow who had offended by giving a rose to Koneczny's girlfriend (Paula). Headed for the jeep, the three walked past a railroad line; the defendants threw some logs on the tracks. They stopped at Honey Farms, where the men bought a "grinder." Walking on, the men took a sheet off a clothesline, to be used to save their hands as they broke the windows of the jeep. Foskette produced a knife with a fixed blade from his backpocket and slashed a tire on each of four cars along the way. The jeep, however, was not at the place supposed.

Then Foskette asked about going to the underground fort, a place Susan did not know. They walked to a wooded area in a rural residential area called Sherwood Forest. The fort consisted of wooden planks over dugouts. They walked further into the woods. The sheet was spread on the ground and they sat there smoking cigarettes. Susan had a Marlboro pack with only a couple of cigarettes and another full pack. When the first was empty, she threw it to the ground.

Foskette asked, did she want to learn a trick. She was to put her hands out. When she did so, Foskette taped her hands with black tape that he drew from his jacket. She asked him to undo it. He said, "Just shut up." At that point, Koneczny was taking her pants down. She was fighting him

and kept on fighting.[3]  She said they both had girlfriends; they were sick. They told her to count to fifty and it would be over. They got to her breasts and pinched them. Foskette cut the tape but held her hands and held her down. Koneczny pulled down his pants and underwear and exposed himself. She saw that he was circumcised.[4] He was on top of her and went inside of her with his penis. As he withdrew, he laughed and said, "I got off." Susan felt warm inside and believed he had ejaculated. Foskette said, when Koneczny was still on top of her, if she told anybody, she was dead. She asked for the roll of tape and threw it into the woods.[5]

When it was over, she resumed her clothes and asked if they would at least walk her to the road. Foskette left. Koneczny walked with her to the road, and left. It happened that her distant relative came by in a car and gave her a ride back to Webster. The time was now 5:30 A.M., September 24.

She went home and to sleep, after piling the clothes she had been wearing at the foot of her bed. Rising at noon, she showered. She called Betty and met her at Dairy Express. She told Betty what happened, then told Hannah, who was present.   She left with Hannah. After an interval of time, undescribed, Susan arrived with Hannah around dusk at The Log, a place in the woods where teenagers met for keg parties. Among others, the defendants,[6] Koneczny's girlfriend Paula, and Ernest were on hand. Hannah spoke to Foskette, and Susan overheard Foskette saying it was true. Susan talked with Ernest; she said, "I didn't tell him nothing." Ernest walked her down the road where a ride to Webster turned up.

On the point of entering her house — it was now late in the evening — she met a friend from across the street, Rose.

---

[3]Susan said she had bitten Foskette in the hand, and Koneczny in the neck, but Officer Vigeant did not observe marks on the men when when they were at the police station on September 25.

[4]Her observation was stipulated to be true.

[5]The sheet and an empty Marlboro pack were found at the site, but such a tape was not found.

[6]Susan evidently understood from Hannah that Foskette would be at The Log.

She told Rose what was the matter. Rose brought her to the Webster police station, a minute's walk, whence she was taken to the Hubbard Regional Hospital. A standard rape kit was applied and she spoke to a clinical social worker, Zelda. An Oxford police officer, Donald Vigeant, drove her home. The officer picked up the bundle of clothes and brought her and her mother (who had been sought out and telephoned from the hospital) to the police station at Oxford where she was interviewed by Vigeant and another officer.

She returned home in the early morning of September 25. About 11:00 A.M., the defendants appeared at the house, asking to see Susan. They were told she was not at home, and they went away. In fact, Susan was hiding from them "on the other side of the refrigerator."

So ended Susan's testimony. Ernest testified and added his impressions of what had occurred at The Log. Susan had appeared normal at first, then upset. He thought Susan had been arguing with Hannah. Paula was there; it seemed Susan had confronted Paula, for Paula left the place in nearly hysterical condition. Although Susan had testified that she told Ernest nothing, Ernest said she told him of the rape. He asked whether she would go to the police; she was uncertain; he urged her to go. Ernest admitted to a romantic interest in Susan at the time, although she had a boyfriend.

Rose confirmed that Susan told her of the rape. Susan was upset, crying, "a wreck," when Rose brought her to the Webster police station. The social worker, Zelda, testified to the same effect: Susan was shaking, avoiding eye contact; she said the defendants threatened to kill her. The Oxford police officer, Vigeant, gave similar testimony about Susan's condition. He and another officer interviewed her at the Oxford station. At that time she said the sheet was already on the ground when she and the defendants arrived in the woods, and it was there, not at Oxford center, that Foskette had ripped her shirt.[7]

---

[7]Susan recognized these statements as mistakes, which she wanted to correct.

Susan's mother, Thelma, testified that Susan was terrified at the defendants' appearance at the house in the late morning of September 25. Thelma said she and Susan were not on good terms, but Susan's relations with her sister, who lived two houses away, were good.

Turning to the defense, its principal witness was a supervisor at the Department of Public Safety crime laboratory, Boston, who had received the rape kit materials and other materials on September 27. The vaginal smear slides were negative for sperm and seminal fluid residue (acid phosphatase). There was no seminal fluid residue on the vaginal swabs or on Susan's clothing, but leaf fragments and dirt were found on the inner crotch of her panties and blue jeans. No foreign pubic hair appeared, but head hair comparable to Susan's was found on the sheet. If the man did not ejaculate, fluid and sperm would be absent; thorough washing might remove fluid and sperm, but might leave some trace of fluid in the vaginal area.

Hannah conceded that Susan told her of the rape at Dairy Express but her recollection of Susan's account differed in particulars from Susan's testimony. At The Log, Hannah evidently spoke to Foskette about Susan's accusation. Foskette admitted he was out late with Koneczny and Susan, but he denied the rape. Hannah saw Paula "charging at" Koneczny and running away in distress. Susan was crying.

George spoke of the pants and shirt ripping episode at Oxford center. According to George, Susan said she had gone to Webster to get some LSD. He thought Susan was on acid; she was stumbling. George swore he picked up Koneczny at the center at 3:30 A.M. and drove him home; neither Susan nor Foskette was there at the time. The acid story reappeared in the testimony of Mary.

In short rebuttal, the Commonwealth recalled Susan. She had not said she had gone to Webster for acid and she had not in fact taken any that night, although she had used it at an earlier stage, before the death of her cousin (presumably of an overdose).

1. The defendants do not contend that there was insufficient evidence on the whole record for convictions; rather they say the fresh complaint testimony was a significant part of the evidence, and they objected to it.

A person violated sexually may be expected to complain to others; evidence of such complaint — if the complaint was "fresh," and thus probably not a product of imagination or contrivance — may be admitted, not in proof of the criminal occurrence, but in corroboration of other evidence of it. See *Commonwealth* v. *Bailey*, 370. Mass. 388, 392 (1976). In the present case, it could be suggested that Susan overlooked opportunities to tell her story promptly following the event, say to the distant relative with whom she hitched a ride to Webster, to her mother's boyfriend who was asleep at her home, to her sister who may have been two doors away, or to her mother who, however, was not at home that night. She might have gone direct to the Webster police station, a minute's walk from her home. Instead, Susan went to sleep, washed herself the next morning, and first complained to a friend about 2:30 P.M. that day, some thirteen hours after leaving the fort area. Thereafter she told her story a number of times, and finally to a neighbor who took her to the police.

The question for decision by the trial judge was whether the circumstances called for a ruling, as matter of law, that excluded the complaints as being stale, or, to the contrary, called for submission of the issue of "freshness" to the jury under proper instructions. We have no doubt that, when the whole story is considered, the judge was right to take the latter course. Freshness is not, or is not entirely, a matter of counting the hours between the event and first declaration. But on that level we note that young victims are indulged in their natural indeciveness, see *Commonwealth* v. *Dockham*, 405 Mass. 618, 625 (1989), and that the lapse of time here is not excessive by comparison with the facts in other decided cases.[8] Such lack of firmness as appears in Susan's conduct

---

[8]The Commonwealth refers to cases of victims of roughly comparable age: *Commonwealth* v. *Comtois*, 399 Mass. 668, 669 n.1, 672-673 (1987); *Commonwealth* v. *Cobb*, 26 Mass. App. Ct. 283, 285 (1988).

can be attributed to the shock of the physical invasion and to the working out of her traits of character in her milieu; her delay hardly suggests that she was inventing or imagining a false story. She appears in the record as an empty, poorly educated, aimless, rootless, reckless teenager, ruled by sensation or appetite, unchecked by guidance of parent or family, dependent on friendships or connections with youngsters similarly handicapped. She can recognize outrage and humiliation in the rape, but she is confused — to some degree, perhaps, by notions of the loyalty expected of her in relation to her fellows, which may counsel against doing anything that would end with the police. To the confusion is added fear that the defendants may carry out their threat. See *Commonwealth* v. *Lagacy*, 23 Mass. App. Ct. 622, 625-626 (1987). These were matters for appraisal by a jury responding to the judge's instructions on the question of fresh complaint, given during and at the close of the case.

2. Rape is "aggravated" if it is committed, as here, through joint venture (on which the judge instructed the jury). It has been held that indecent assault[9] is formally a "lesser" offense "included" in the aggravated rape — a subset of the latter. See *Commonwealth* v. *Thomas*, 401 Mass. 109, 119-120 (1987). This is so except in a situation where there is an act, distinct from the rape (although it may be associated contemporaneously with the rape), that in itself qualifies as an indecent assault. See *Commonwealth* v. *Mamay*, 407 Mass. 412, 418 (1990). The pinching of the victim's breasts in the present case, before penetration, might be seen as such an act. However, the prosecution did not contend for a conviction of indecent assault on that basis, nor did the judge charge on that theory. Accordingly, we revert to the formal overlap of the two crimes, and vacate the judgment of conviction of the lesser. See *Commonwealth* v. *Sanchez*, 405 Mass. 369, 381-382 (1989). It does not matter that the defendant's counsel missed the point and did not take due objection. *Ibid.*

---

[9]This is the general indecent assault statute, that is, for assault on persons over the age of fourteen.

We think the conviction for rape of a child should be held not absorbed in that for aggravated rape. Aggravated rape requires a violation of the will of the victim and has here the feature of joint venture. The "statutory" rape requires neither of these elements (the victim may have acquiesced in the penetration) but stipulates that the victim be less than sixteen years of age. So it may be said that there is not formal duplication. We do, however, find particular instances where, despite the absence of such duplication, "the realities of the offenses and the circumstances within which they occur" indicate they are minor variations on one theme of evil, and double punishment would be too harsh. See *Costarelli* v. *Commonwealth*, 374 Mass. 677, 684 (1978) (larceny of a motor vehicle and unauthorized use of it); *Commonwealth* v. *Jones*, 382 Mass. 387, 392-394 (1981) (involuntary manslaughter and vehicular homicide). See also *Kuklis* v. *Commonwealth*, 361 Mass. 302, 308 (1972). We are not inclined to assimilate the present case to those just cited; the rape of a child may be considered an evil not coincident in policy with general rape or aggravated rape. It is instructive that our criminal legislation shows at various points a special concern with younger victims. So, for example, the penalty for forcible rape (G. L. c. 265, § 22[*b*]) is less severe than that for rape of a child (G. L. c. 265, § 23) or forcible rape of a child (G. L. c. 265, § 22A); and see the special treatment of child pornography (G. L. c. 272, § 29A).

The judgments of conviction of indecent assault and battery are vacated, the verdicts are set aside, and the indictments are to be dismissed. The other judgments are affirmed.

*So ordered.*