COMMONWEALTH vs. CHRISTIAN AMADO.

Suffolk.  May 3, 1982. — August 20, 1982.

Present: HENNESSEY, C.J., WILKINS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Homicide. Identification. Practice, Criminal*, Required finding. *Constitutional Law*, Double jeopardy.

At the trial of an indictment for murder, in which the Commonwealth's identification evidence consisted of a positive in-court denial by the identification witness that the defendant was the perpetrator of the crime, coupled with a showing only that the witness had selected a photograph of the defendant before the trial, had identified the assailant as "Bugsy," and had associated the name "Bugsy" with the defendant, there was lack of probative evidence that any out-of-court identification was made, and the judge erred in denying the defendant's motion for a required finding of not guilty. [186-189]

The double jeopardy principle precluded retrial of a defendant whose criminal conviction was reversed by reason of the trial judge's error in denying his motion for a required finding of not guilty. [190]

INDICTMENT found and returned in the Superior Court Department on April 10, 1980.

The case was tried before *Abrams*, J.

*Frank G. Kelleher & Walter T. Healy* for the defendant.

*Carol Anne Fagan*, Assistant District Attorney (*Peter J. Muse*, Legal Assistant to the District Attorney, with her) for the Commonwealth.

LYNCH, J.  On October 29, 1980, a jury in the Superior Court in Suffolk County found Christian Amado guilty of murder in the first degree.  He was sentenced to life imprisonment and filed a timely notice of appeal.  The defendant's principal contentions are that the trial judge erred by allowing three police officers to testify regarding an alleged pretrial identification of the defendant by the chief prosecution witness, and by denying the defendant's motion for a

required finding of not guilty, which he made at the close of the Commonwealth's case and renewed at the close of all the evidence (see Mass. R. Crim. P. 25, 378 Mass. 896 [1979]). He also claims error with respect to two other evidentiary rulings of the judge. We conclude that the defendant's motion for a required finding of not guilty should have been allowed and we reverse the judgment of conviction. We, therefore, do not discuss the defendant's other claims of error.

We summarize the testimony concerning events which occurred on the night of the murder. On February 4, 1980, between 6:30 P.M. and 7 P.M., Willie Ashley, a resident of 131 Zeigler Street in the Roxbury section of Boston, was returning home from walking his dog when he encountered the victim, George Sneed. They walked together to 131 Zeigler Street and Ashley went inside, leaving Sneed standing on the front stairs. Frederick Johnson was visiting his fiancée who lived at 13 Cluny Court, directly across the street. While Ashley was in his apartment, Johnson approached the entrance, hoping to borrow cigarettes from one of several acquaintances who lived in the building. He spoke briefly with Sneed and was about to ring a doorbell when Ashley came out, talked to Johnson and Sneed for a moment, then walked up the street. Johnson and Sneed remained on the steps.

Johnson rang a doorbell and was waiting for someone to answer when he heard a sound from behind him. He turned and saw a man step up to the stairwell. The man pulled a rifle from underneath his coat and said to Sneed, "Do you think I'm some kind of faggot or punk?" He then shot Sneed three times, turned and ran. Johnson, who had put his hands up when the assailant first produced the rifle, started to run in the same direction as the assailant, then changed his mind, and returned to his fiancée's apartment. Two police officers who were in the area were directed to the scene of the shooting. They arrived at the scene at approximately 8:30 P.M., but were unable to obtain any information about the shooting from the crowd that had gathered.

The key issue at trial was the identity of the assailant, and the crucial witness on identity was Frederick Johnson, the only eyewitness to the murder. His testimony and that of police officers concerning Johnson's alleged pretrial photographic identification of the defendant will be discussed in some detail later in this opinion.

Apart from the testimony of Johnson and testimony attributed to him by others, there was little evidence linking the defendant to the crime. Willie Ashley heard the three shots as he walked away from the scene and, upon turning, saw two people running away from the building. It was too dark for him to see the individuals well enough to describe them. He testified that one of them had his hands up and "looked like Freddie [Johnson] . . . from a distance," although he admitted on cross-examination that he "couldn't definitely say it was Freddie." The other man was "tall . . . [a]bout 6½ feet," and was wearing a long, dark coat and a dark hat. Asked on cross-examination whether this other person was taller than the defendant, whom Ashley had seen before but did not know personally, Ashley replied, "I couldn't tell. I don't know."

*Testimony on the identity of the assailant.*[1] Frederick Johnson was called to testify at trial as a witness for the Commonwealth. He readily answered a series of questions on the sequence of events which culminated in the murder of George Sneed. On the issue of the identity of the assailant, however, Johnson was an extremely reluctant witness for the Commonwealth. He described the assailant at trial as a tall, light complexioned black man with a large nose who was wearing a knit skull cap "pulled down to the top of his eyebrows," "a turtleneck or a scarf . . . pulled up to his top lip," and a dark three-quarter length coat. Asked whether he recognized the assailant as someone he had seen before, he answered, "No." Immediately after this collo-

---

[1] The defense was alibi. Two witnesses testified that the defendant was with them on the night of the murder. Their testimony is not relevant to the issues on appeal and we therefore do not discuss it.

quy, the prosecutor asked Johnson a number of questions about the defendant. Johnson testified that he did not know the defendant personally but had seen him "[a] couple of times" before February 4, 1980, the date of the murder.

Evidence was introduced that on February 11, 1980, Johnson accompanied Willie Ashley to the district two police station in Roxbury after Ashley informed Johnson that the police wanted to talk with him about the murder. At trial, the prosecutor questioned Johnson extensively concerning events which occurred at the station in an effort to show that Johnson made a positive identification of the defendant as the killer at this time. Johnson's testimony became increasingly evasive and confusing, and the prosecutor repeatedly sought to "refresh his recollection" of events at the station by showing him what purported to be a transcript of a taped statement he had given to the police at the station.[2] Johnson admitted having gone to the station and having talked there with a Detective Lawrence Celester and then with two other homicide detectives who arrived later. He testified that he had answered questions about the murder and had given a statement regarding his observations and that his answers and statement had been taped. When first asked whether, during the course of his statement, he had given a description of the person he saw on February 4, 1980, Johnson replied that he had given "a description of a picture I had looked at." He denied having given the police any description of the assailant. After he was reminded of his in-court description of the assailant, however, Johnson admitted having given the same description to the police on February 11, but claimed not to remember whether his oral description had been taped. When Johnson was shown the transcript of his statement to refresh his recollection, and

[2] Later in the trial, the Commonwealth sought to have the taped statement admitted in evidence for the purpose of showing Johnson's "state of mind at the time he made the statement," and to "corroborate" Johnson's alleged identification of the defendant as the assailant. On objection by the defendant, the judge ruled that the document was not admissible.

was pressed further as to the description he had given, he stated, "I gave the description of the man I saw in the picture that Detective Celester showed me. Before the detectives came." This answer was struck as unresponsive, on objection of the Commonwealth. The judge then said, apparently in an effort to clarify the situation, "The question to this witness, which requires your answer, is that if this statement . . . which was taped does refresh your recollection, what did you — *how did you describe the defendant*, not as you described him after being shown a photograph, but *on the night of February 4th*" (emphasis added). Johnson then stated that, at the police station, he had given "the description of a man that closely resembled the man that I might have seen."

Johnson's testimony with respect to the photographs shown to him at the station was equally confusing. He first testified that Detective Celester had shown him a set of eight photographs before the homicide detectives arrived, that he had not recognized any of the photographs "outright," but the face in one photograph "looked familiar." Asked whether he saw that face in the court room, Johnson pointed to the defendant. He testified that police officers had shown him two other sets of photographs at the station and that he had seen "familiar faces" in both sets but had seen no one who was present in the court room. With respect to his taped statement, Johnson did not remember the questions he had been asked, the answers he had given, whether he has been shown photographs during the taping, or whether he had picked out any photographs.

After the trial resumed the next day, Johnson testified that while at the station on February 11 he had identified a photograph of the defendant.[3] He said he "knew of" the defendant and he thought "they call him Bugsy."[4] The

---

[3] The photograph of the defendant which Johnson had identified was admitted in evidence through Johnson without objection.

[4] It was at this point that Johnson was asked whether he had given the police a description of the killer and testified that he had not.

prosecutor did not ask Johnson whether the photograph he had identified was that of the killer. Later, Johnson testified that a set of photographs had been shown to him during the taping and that he had picked out the photograph of the defendant at that time. The prosecutor then asked Johnson whether he had "given the name Bugsy during the course of the taping." After his memory was refreshed with the transcript of his statement, Johnson affirmed that he had "given the name Bugsy during the statement." At this point, defense counsel asked that Johnson be allowed to read the answer that he had given. The colloquy set out in the margin followed.[5]

The prosecutor never asked Johnson whether the defendant was the man who killed George Sneed. On cross-examination by defense counsel, Johnson testified that the defendant was not the assailant and was not at the scene on the night of the murder. When pressed, Johnson stated that he was "positive" that the defendant was not the killer.

---

[5] THE PROSECUTOR: "'Would you recognize this man?' What's your answer to that?"

THE WITNESS: "'Yes.'"

THE PROSECUTOR: "'Do you have the name of this man?'"

THE WITNESS: "'I think they call him Bugsy.'"

THE PROSECUTOR: "That's your answer?"

THE WITNESS: "Yes."

THE PROSECUTOR: "A further question. 'Do you know Bugsy?' Is that correct?"

THE WITNESS: "Yes."

THE PROSECUTOR: "And what's your answer to that?"

THE WITNESS: "'Not personally.'"

THE PROSECUTOR: "Did you say, 'Not personally, but someone I had seen around.' Is that your statement?"

THE WITNESS: "Yes."

THE PROSECUTOR: "And the question, 'If you saw him again, would you recognize him?'"

THE WITNESS: "'Yes.'"

Since the questions which preceded this colloquy all related to Johnson's selection of the defendant's photograph and his "giving the name Bugsy," it would appear that the "man" referred to in the second question read from the transcript is the man in the photograph selected by Johnson and not the man who killed George Sneed.

Detectives Lawrence Celester, George H. Whitley, and John R. Spencer testified that they interviewed Johnson at the police station on February 11, that the interview was taped, and that Johnson picked out the defendant's picture from an array of eight photographs shown to him during the taped session. Over the defendant's objection, each detective was allowed to testify to a description of the killer which Johnson gave during the interview. Celester testified, over objection, and after the question had been rephrased several times, that Johnson gave the name of the assailant as "Bugsy."[6] Whitley and Spencer testified that Johnson had picked out a photograph of the defendant from the array of eight that had been shown to him. They then testified, again over objection, that Johnson had given the name of the assailant, that he had "associate[d] a name with the photograph that he picked out," and that the name was "Bugsy."

---

[6] The relevant portion of the transcript reads as follows:

THE PROSECUTOR: "Was any name given of an assailant by Freddie Johnson?"

DEFENSE COUNSEL: "Object."

THE JUDGE: "I am going to sustain the objection in that form."

THE PROSECUTOR: "In the course of his description, in the course of Freddie Johnson's description of the assailant, the description you just gave, did he also give the name of the assailant?"

DEFENSE COUNSEL: "Objection."

THE JUDGE: "Did he give the name of an assailant? I am going to allow that question in that form. Yes or No."

THE WITNESS: "Yes."

THE JUDGE: "Did he give a name? Isn't the question, did he give a name?"

THE PROSECUTOR: "Name of the assailant."

THE JUDGE: "I will allow the question and note your objection. The answer is Yes?"

THE WITNESS: "Yes, he did."

THE PROSECUTOR: "What name did he give you?"

DEFENSE COUNSEL: "Objection, your Honor."

THE JUDGE: "I am going to allow it."

DEFENSE COUNSEL: "Pure hearsay."

THE JUDGE: "I note your objection."

THE PROSECUTOR: "What name did he give?"

THE WITNESS: "He gave the name of Bugsy."

*Denial of motions for required finding of not guilty.* In the present case, Johnson testified unequivocally at trial that the defendant was *not* the killer. Further, the thrust of Johnson's testimony on his pretrial "identification" of the defendant was that he chose the defendant's picture because the face "looked familiar." In effect, Johnson denied making *any* pretrial identification of the defendant as the assailant. This court has said in a recent decision that it is "doubtful" whether the testimony of witnesses to an alleged identification would be admissible as substantive evidence in these circumstances. *Commonwealth* v. *Furtick*, 386 Mass. 477, 481 n.2 (1982). Accord, *Commonwealth* v. *Swenson*, 368 Mass. 268, 272-273 n.3 (1975). We assume, solely for the purpose of deciding this case, that the testimony of the three police officers was properly admitted and could therefore be considered by the judge "in conjunction with other substantive evidence [of guilt] in evaluating the disposition to be made on [the defendant's] motion for a directed verdict." *Commonwealth* v. *Fitzgerald*, 376 Mass. 402, 408 (1978). Even if this testimony is taken into consideration, the Commonwealth's evidence was not sufficient to warrant a verdict of guilty of murder.

The standard which we apply in reviewing the propriety of the denial of a motion for a required finding of not guilty is "whether the evidence, read in a light most favorable to the Commonwealth, was sufficient to satisfy a rational trier of fact of each element of the crime beyond a reasonable doubt." *Commonwealth* v. *Basch*, 386 Mass. 620, 622 (1982). *Commonwealth* v. *Toney*, 385 Mass. 575, 582 (1982). *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-678 (1979). We conclude that the defendant's motion for a required finding of not guilty, made at the close of the Commonwealth's case, should have been granted.

The only serious issue at trial was whether the defendant killed George Sneed. Johnson, the only eyewitness to the crime, testified that the defendant was not the killer. The jury's verdict can only be explained as reflecting their belief that Johnson positively identified the defendant as the killer

during his visit to the police station on February 11, 1980. Neither Johnson nor any of the three police officers who were present at this interview testified that Johnson had identified the photograph of the defendant as that of the assailant. The testimony of these witnesses tended to prove only that Johnson picked the defendant's photograph, gave a description of the assailant, gave the name of the assailant as "Bugsy," and "associated" the name Bugsy with the photograph he had selected. In the case of each detective, these facts were elicited in the order stated. The missing fact, i.e., that Johnson had identified a photograph of the defendant as depicting the assailant, could not properly be inferred from this testimony beyond a reasonable doubt. Certainly a defendant can not be convicted on the basis of nothing more than inferences suggested by the sequence in which questions were put to the witnesses.[7] When the testimony of the three police officers is viewed in the light of the absence of any in-court identification of the defendant, and in light of Johnson's testimony that he picked the photograph of the defendant only as that of someone he had seen before, the officers' testimony was not sufficient to prove beyond a reasonable doubt that Johnson had identified the defendant as the killer.[8]

---

[7] At several points during his questioning of Johnson, the prosecutor elicited from Johnson that he had selected a photograph of the defendant, that he "knew of" the defendant, and that he knew that the defendant was called "Bugsy." The prosecutor would then proceed to question Johnson regarding his description of the killer, thus suggesting that the defendant was in fact the killer. The power of this suggestion is reflected in one of the judge's efforts to clarify a question by the prosecutor. The judge inadvertently rephrased a question put to Johnson as, "[H]ow did you describe the defendant, not as you described him after being shown a photograph but on the night of February 4th?" The prosecutor employed a similar tactic in examining the three police officers. He first asked questions about Johnson's selection of a photograph and then proceeded immediately to questions about Johnson's description of the killer.

[8] We take note also of the likelihood that the jury were prompted to draw unwarranted inferences from the prosecutor's repeated use of a written document which purportedly contained statements Johnson had given to the police on February 11, but which was not in evidence, to "refresh" Johnson's recollection. Compare *Douglas* v. *Alabama*, 380 U.S. 415, 416-417, 419 (1965).

The Commonwealth points to the statement in *Commonwealth* v. *Vitello*, 376 Mass. 426, 461 (1978), that "an extrajudicial identification may in an appropriate case provide a jury with a sufficient basis upon which to find a defendant guilty beyond a reasonable doubt." In *Vitello*, although the identification witness testified at trial that the defendant was not the robber, he also testified that he had been positive of his extrajudicial identification of a photograph as being that of the offender. *Id.* at 457-459. In this case, by contrast, there was no direct evidence that the photograph chosen by Johnson was a photograph of the assailant.

The Commonwealth's reliance on *Commonwealth* v. *Fitzgerald*, 376 Mass. 402 (1978), and *Commonwealth* v. *Bishop*, 9 Mass. App. Ct. 468 (1980), is also misplaced. Those cases established only that identification evidence may be sufficient to warrant submission of the case to a jury even though it is "inconsistent and contradictory." *Commonwealth* v. *Fitzgerald, supra* at 410-411. *Commonwealth* v. *Bishop, supra* at 472. In both cases, there were in-court identifications of the defendants as well as other, less positive in-court references to the defendants. Thus, there was probative identification evidence for the jury. The contradictions in the witnesses' testimony merely raised a credibility issue for the jury to decide. Our holding in this case is simply that there was no probative identification evidence for the jury. The Commonwealth's evidence consisted of a positive in-court denial that the defendant was the assailant coupled with a showing that the identification witness selected a photograph of the defendant before the trial, identified the assailant as "Bugsy" and associated the name "Bugsy" with the defendant. It should be noted that the testimony concerning the extrajudicial identification did not directly refute Johnson's in-court testimony concerning what transpired at the police station. As an evidentiary matter, the probative value of the pretrial identification evidence *is* seriously impaired, if not negated, by the witness's own in-court testimony. See *Commonwealth* v. *Swenson*, 368 Mass. 268, 272-273 n.3 (1975), citing *Gibbs*

v. *State*, 7 Md. App. 35 (1969). When the extrajudicial identification evidence is viewed as a whole, there is more than a credibility question. There is a lack of probative evidence that an extrajudicial identification was made at all.

The remainder of the evidence introduced by the Commonwealth furnishes no basis for the defendant's conviction. In summary, the other evidence of the defendant's involvement consisted of the following: the defendant attended the victim's wake, and, while there, claimed to have been "partners" with the victim; at the wake, the defendant was wearing clothing similar to that which Johnson described the assailant as having worn four days earlier; the defendant was in California when arrested for the murder, and later escaped from a hospital to which he had been admitted while incarcerated pending trial. In addition, Detective Celester was allowed to testify that the defendant became a suspect two days after the murder and that the police "staked out" several places in a search for him.[9] It cannot be seriously contended that these facts, taken together, "are of sufficient force to bring minds of ordinary intelligence and sagacity to the persuasion of [guilt] beyond a reasonable doubt." *Commonwealth* v. *Latimore*, 378 Mass. 671, 676 (1979), quoting from *Commonwealth* v. *Cooper*, 264 Mass. 368, 373 (1928).[10] The evidence was insufficient to warrant conviction as a matter of law. It was error to deny the defendant's motion for a required finding of not guilty in these circumstances.

---

[9] The defendant objected when Detective Celester was asked for the name of the suspect but, after his objection was overruled, he requested no limiting instruction with respect to this evidence. On appeal, he claims error concerning the admission of this testimony. Our resolution of the case makes it unnecessary for us to discuss this claim of error. We note only that the challenged testimony would not support a reasonable inference that the suspect was in fact guilty.

[10] This court had occasion only recently to comment on the "equivocal nature of evidence of flight" as probative of consciousness of guilt. *Commonwealth* v. *Toney*, 385 Mass. 575, 583-585 & n.6 (1982).

*Double jeopardy.* Since we have concluded that the Commonwealth's evidence was insufficient to sustain the jury's verdict, it follows that a retrial of the defendant would violate established principles of double jeopardy. *Burks* v. *United States,* 437 U.S. 1, 17-18 (1978). In this situation, "[t]he Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." *Id.* at 11. This disposition of the case is compelled even though the defendant had not specifically requested it. *Id.* at 17-18. We therefore reverse the judgment of conviction against the defendant, set aside the verdict, and remand the case to the Superior Court for entry of a judgment of acquittal.

*So ordered.*