## COMMONWEALTH vs. HOWARD SHELINE.

Essex. April 5, 1983. — February 24, 1984.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Controlled Substances. Evidence,* Certificate of drug analysis, Alias, Reputation. *Practice, Criminal,* Examination of jurors, Instructions to jury. *Words,* "Reasonable doubt."

At the trial of an indictment charging knowing possession of cocaine with intent to distribute, evidence of the circumstances in which the defendant, one Howard Sheline, received an unopened package addressed to "Howie Tuna" and delivered by common carrier to a marina where the defendant was employed warranted the conclusion that the defendant knew that there was cocaine in the package. [283-285]

At the trial of a narcotics case, the erroneous admission in evidence of a portion of a State chemist's certificate which stated that the defendant was also known as "Howie Tuna" did not prejudice the defendant, where there was uncontroverted testimony that the defendant was not known by that name, where the prosecutor in closing argument assumed that the defendant was not generally known as Howie Tuna, and where the judge instructed the jury that the certificate was evidence of the chemical composition of the drug in question. [285-287]

At the trial of an indictment charging possession of cocaine with intent to distribute, the judge did not err in excluding certain evidence of the defendant's reputation for truth and veracity. [287-289] ABRAMS, J., with whom NOLAN, J., joins, concurring.

The judge in a criminal case was not required to ask prospective jurors whether they would believe the testimony of a law enforcement officer more than that of any other witness where the defendant offered nothing more in support of his request than an allegation that there is a "widespread belief" among the general public that a police officer is more credible than an ordinary citizen. [289-291]

At the trial of a criminal case no substantial risk of a miscarriage of justice was created by the judge's unobjected-to instructions to the jury on reasonable doubt despite the judge's use of a negative definition of reasonable doubt and his warning of the consequences of holding the Commonwealth to too strict a standard of proof. [291-297]

INDICTMENT found and returned in the Superior Court Department on February 4, 1980.

The case was tried before *Sherman*, J., a District Court judge sitting under statutory authority.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Brownlow M. Speer* for the defendant.

*Joseph B. Green*, Assistant District Attorney (*Charles M. Wyzanski*, Assistant District Attorney, with him) for the Commonwealth.

O'CONNOR, J. The defendant, Howard Sheline, was convicted by a jury of knowing possession of a class B controlled substance (cocaine) with intent to distribute. He was fined and sentenced to a term of one year in a house of correction, with six months to be served and the balance suspended for two years.[1] The Appeals Court summarily affirmed the conviction, *Commonwealth* v. *Sheline*, 14 Mass. App. Ct. 1305 (1982), and this court allowed the defendant's application for further appellate review. The defendant argues that the trial judge erred (1) by denying his motions for a required finding of not guilty presented at the close of the Commonwealth's case and again at the close of all the evidence, (2) by excluding testimony of his reputation for truth and veracity, (3) by admitting in evidence a Department of Public Safety certificate bearing the defendant's name and alleged alias, (4) by refusing to ask prospective jurors on voir dire if they would believe the testimony of a police officer more than the testimony of any other witness, and (5) in instructing the jury. We find error only in the admission of the unsanitized certificate, and we conclude that that error was not prejudicial. Accordingly, we affirm the conviction.

The following facts were stipulated by the parties at trial. A package was brought to the office of the United Parcel Service (U.P.S.) in Fort Lauderdale, Florida, on September 28, 1979. The package was addressed to "Howie Tuna, R.95

---

[1] The defendant has served his prison term.

East Main Street, Gloucester, Massachusetts 01930." The return address was "M. Shark, 940 Sweetwater Lane, Boca Raton, Florida 33432." The U.P.S. contacted the Florida office of the United States Drug Enforcement Agency (D.E.A.). The D.E.A. took custody of the package after examining its contents, and on October 4, 1979, sent the package to its Boston office.

The jury could have found the following facts from the Commonwealth's evidence. On October 11, 1979, an agent of the Boston office of the D.E.A. delivered the package to the Gloucester police station, where State and local police officers examined its contents. The package contained forty-eight grams of a powder consisting of 23.5% cocaine and having a street or retail value of approximately $4,800. The officers decided to make a "controlled delivery" of the package to the address written on the package. "R.95 East Main Street" referred to the rear of 95 East Main Street.

At that address was the Portside Marina, a small building which contained a bait and tackle shop and the business office of a marina. Clayton Brooks leased and operated Portside Marina. He employed the defendant, who was known as "Howie," to take care of the shop while he was not there, and to do "odd jobs" around the marina. Both Mr. Brooks and the defendant would sign for packages that were delivered to the marina. By October 11, most boats had left or were leaving the marina, and the store's business was winding down. Mr. Brooks would "drop in" most days but had ceased working full time. Other than local lobster boats, there remained only three or four pleasure boats, all of which had been at the marina during the boating season. Before October 11, 1979, none of these boats had ever received a package at Portside Marina, and no packages were delivered by U.P.S. to Portside Marina from October 11, 1979, until at least the end of that year.

During the week before the controlled delivery, the defendant twice asked the regular U.P.S. driver if there were any packages for him. On each occasion, the driver said,

"No." The defendant had never before asked that driver about the delivery of any packages.

The controlled delivery was made on October 11, 1979. A State police officer, James Jajuga, dressed in a U.P.S. uniform and driving a U.P.S. truck, stopped at the rear of 95 East Main Street. He carried the package and a clipboard with a form used by U.P.S. to record the signature of package recipients. As the U.P.S. truck arrived, the defendant left his seat at the Clam Shack restaurant, located adjacent to Portside Marina, and walked toward that building. The defendant stopped at the building and fumbled with its lock as Jajuga walked by. Jajuga stopped and walked over to the defendant. He pointed to the package and asked where the address was. The defendant answered, "Right here." The defendant then opened the door to the building and walked inside. As Jajuga followed him inside, he pointed to the name of the package and asked, "What about this guy?" The defendant replied, "He's on one of the boats out back." Jajuga brought the package into the bait and tackle shop and put it on a counter. He asked the defendant if the addressee would pick up the package, and the defendant responded, "Yes, he will stop in." The defendant then signed his name to the U.P.S. delivery record, and Jajuga left the building and returned to the Gloucester police station.

After signing for the package, the defendant returned to the Clam Shack restaurant, leaving the package in the bait and tackle shop. About thirty minutes later, the defendant went out the back door of the restaurant. He stood at the top of the stairs for about a minute, observing the parking area between Portside Marina and the Clam Shack. He came down the stairs and walked to the corner of the Clam Shack building. The defendant then looked around the parking lot, and into the cab and back of a pickup truck. After taking another look around the parking lot, the defendant walked toward the marina office. At that time, Clayton Brooks, the defendant's employer, arrived. The defendant and Mr. Brooks conversed for fifteen or twenty

seconds, and then entered the office together. The defendant took the package from where it had been on top of the counter and put it behind the counter.

A few minutes later, the police entered the marina office with a warrant to search for narcotics. After advising the defendant of his Miranda rights, the police asked him if he knew Howie Tuna. The defendant stated that he did not. When asked if he had ever received a package from "the person named" (inferentially, the return addressee M. Shark), or anyone else, the defendant replied that he had not. Upon further questioning at the police station, the defendant stated that he did not know whom the package was for, he just signed for it. In response to questioning about the name Howie Tuna, the defendant stated that he thought it was the name of one of the boats in the marina.

1. *Sufficiency of the evidence.* At the close of the Commonwealth's case, and again at the close of all the evidence, the defendant moved for a required finding of not guilty. The defendant argues on appeal that it was error to deny his motions because the evidence did not permit a finding of knowing possession. "The standard which we apply in reviewing the propriety of the denial of a motion for a required finding of not guilty is 'whether the evidence, read in a light most favorable to the Commonwealth, was sufficient to satisfy a rational trier of fact of each element of the crime beyond a reasonable doubt.'" *Commonwealth* v. *Amado,* 387 Mass. 179, 186 (1982), quoting *Commonwealth* v. *Basch,* 386 Mass. 620, 622 (1982). See *Commonwealth* v. *Latimore,* 378 Mass. 671, 676-678 (1979). We consider the state of the evidence at the close of the Commonwealth's case to determine whether the defendant's motion should have been granted at that time. We also consider the state of the evidence at the close of all the evidence, to determine whether the Commonwealth's position as to proof deteriorated after it closed its case. *Commonwealth* v. *Basch, supra* at 622 & n.2. In this case, the Commonwealth's proof did not deteriorate after its case closed. Consequently, the issue before us is whether the evidence introduced by

the Commonwealth "was sufficient to satisfy a rational trier of fact of each element of the crime beyond a reasonable doubt." *Commonwealth* v. *Amado, supra.*

In the absence of other evidence, possession of an unopened package, received by mail or common carrier and containing drugs, does not warrant an inference beyond a reasonable doubt that the defendant possessed the drugs knowingly. See *Commonwealth* v. *Aguiar,* 370 Mass. 490, 499 (1976). Accord *Hilding* v. *State,* 291 So.2d 111, 112-113 (Fla. Dist. Ct. App. 1974); *Rutskin* v. *State,* 260 So. 2d 525, 525-527 (Fla. Dist. Ct. App. 1972); *People* v. *Ackerman,* 2 Ill. App. 3d 903, 905-906 (1971); *State* v. *Richards,* 155 N.J. Super. 106, 109-119 (1978); *People* v. *Patello,* 41 A.D.2d 954, 954-955 (N.Y. 1973); *Commonwealth* v. *Rambo,* 488 Pa. 334, 335-340 (1980); *Commonwealth* v. *Sterling,* 241 Pa. Super. 411, 413-417 (1976). In this case, however, there was other evidence that the defendant knew the contents of the package.

The following facts, warranted by the stipulation and the evidence, are especially significant: The defendant twice inquired of the regular U.P.S. driver whether there were any packages for him, never having done so before. Approximately one week before those inquiries were made, the package that was ultimately delivered to the defendant on October 11, 1979, had been brought to U.P.S. in Florida for shipment to Howie Tuna at the marina. The defendant's first name is Howard and his employment at the marina was such that he would receive packages directly from the U.P.S. deliveryman. None of the pleasure boats at the marina on October 11, 1979, had ever before received a package there, and U.P.S. did not deliver any packages to the marina during the balance of 1979. The jury would have been warranted in concluding from the evidence that the package that was delivered by Officer Jajuga was expected by the defendant, and that the defendant was looking for it because he was anxious to receive it.

That the defendant was anxious to receive the package was further shown by the evidence that when Officer Jajuga

delivered it, the defendant told the officer that the addressee on the package was on one of the boats out back and would be in to pick it up. The defendant subsequently told the police that he did not know Howie Tuna and that he thought that that name might refer to one of the boats. The jury could have inferred that the defendant's statements to Officer Jajuga when he delivered the package were intentionally false and were designed to influence Officer Jajuga, who the defendant thought was a U.P.S. deliveryman, to leave the package rather than to hold it because the addressee was unknown.

From the fact that the defendant was anxious to receive the package, the jury properly could have inferred that he knew what was in it. That the defendant knew what was in the package also was indicated by the evidence of the care with which the defendant surveyed the area between the Clam Shack restaurant and the marina after the package was delivered. That evidence supports the inference that the defendant was attempting to ascertain whether he was under surveillance and whether he could safely remove the package from the marina. The defendant's motions for a required finding of not guilty were properly denied.

2. *The admission of the unsanitized chemist's certificate.* At trial, the Commonwealth introduced in evidence a certificate of the chemical laboratory of the State Department of Public Safety. The certificate stated that the white powder in the package addressed to Howie Tuna consisted of 23.5 per cent cocaine. The certificate also stated that the "Defendant or Suspect" in the case was "Howard N. Sheline *aka Howie Tuna*" (emphasis added). Defense counsel requested the trial judge to purge the certificate of the emphasized language, but the judge refused.[2] The judge reasoned that he was powerless to alter the certificate because to do so would "change the hard evidence in the case."

_____

[2] At the outset of the trial, defense counsel successfully moved to strike that portion of the indictment which had identified the defendant as Howard Sheline, "otherwise known as Howie Tuna."

The judge's ruling was erroneous. He should have "sanitized" the certificate before it went to the jury. The averment in the certificate that the defendant was "aka Howie Tuna" was inadmissible hearsay and was unnecessary to the integrity of the certificate. General Laws c. 147, § 4D, as in effect at the time of trial, provided: "A certificate by a chemist of the department [of public safety] of the result of an analysis made by him of a drug furnished him by a police officer of the department, signed and sworn to by such chemist, shall be prima facie evidence of the composition and quality of such drug." St. 1969, c. 434, § 1. Under § 4D, the certificate in this case was admissible to prove the composition and quality of the drug analyzed. That statute, however, did not justify admission of the certificate to prove that the defendant was also known as Howie Tuna. The Commonwealth has not suggested that any other statutory or common law exception to the hearsay rule provided a basis for the admission in evidence of that portion of the certificate which stated that the defendant was "aka Howie Tuna."

Having concluded that it was error to admit that portion of the certificate which stated that the defendant was "aka Howie Tuna," we must consider whether that error harmed the defendant. A defendant in a criminal trial may be prejudiced if the jury's attention is directed to an unproven allegation that the defendant uses an alias. See *D'Allessandro* v. *United States*, 90 F.2d 640, 641 (3d Cir. 1937); *State* v. *Peary*, 176 Conn. 170, 178 (1978); *State* v. *Muniz*, 95 N.M. 415, 417 (1981); *People* v. *Klukofsky*, 201 Misc. 457, 460 (N.Y. Ct. Gen. Sess. 1951); *State* v. *Smith*, 55 Wash. 2d 482, 484 (1960). This is because the use of an alias frequently is associated with criminality. *People* v. *Klukofsky*, *supra*. *State* v. *Smith*, *supra*. The defendant argues that he was prejudiced by the fact that the certificate imputed to him the use of an alias. He impliedly argues as an additional prejudice that he had testified that he accepted delivery of the package not for himself, but for someone else, and that the evidence that he was known by the name appearing

on the package as the addressee suggested that the package was intended for him and was received by him for his own use.

We think that the defendant was not harmed by the admission of the certificate without redaction. First, except for the certificate, there was uncontroverted evidence that the defendant was not known as Howie Tuna. Both Clayton Brooks, the defendant's employer, and Inspector Reardon, who had conducted an investigation into the matter, testified that they had never heard the defendant referred to as Howie Tuna. Second, the prosecutor did not contend in his closing argument that the defendant was so known. In fact, the prosecutor's argument that addressing the package to Howie Tuna was "an attempt to disguise the identity of the receiver" assumed that the defendant was not generally known as Howie Tuna. Third, the judge instructed the jury when the certificate was introduced that "the certificate of the chemist shall take the place of his testimony as if he were on the stand testifying *as to what his analysis showed*" (emphasis added). In his final instructions to the jury, the judge stated that the certificate "is prima facie evidence *of what the drug consists of*" (emphasis added). It is unlikely the jury believed that the chemist's analysis showed that the defendant was also known as Howie Tuna, or that the certificate was evidence of anything but the composition of the powder found in the package.

3. *Exclusion of evidence of defendant's reputation for truth and veracity.* During the presentation of its case, the Commonwealth called as a witness Clayton Brooks, the defendant's employer at the time the package was delivered. On cross-examination of Brooks, defense counsel attempted to elicit testimony of his knowledge of the defendant's reputation for truth and veracity. See G. L. c. 233, § 21A (evidence of reputation in work or business community admissible to same extent as evidence of reputation in community of residence). The judge sustained the Common-

wealth's objections to this line of questioning, and the defendant assigns error to the judge's rulings.

The defendant argues that Brooks' testimony should have been admitted because the truth of the defendant's out-of-court statements as to the identity of Howie Tuna had been attacked by the Commonwealth's evidence, which showed that those statements were inconsistent. At the time Brooks testified, the Commonwealth had introduced evidence that the defendant had stated at the time the package was delivered that Howie Tuna was the name of a person on one of the boats in the marina, but that the defendant had stated after his arrest that he thought Howie Tuna was the name of a boat in the marina. Thus, the defendant's argument is that the Commonwealth's presentation of evidence which showed inconsistencies between his out-of-court statements constituted an attack on the truth of those statements, which allowed him to present evidence of his reputation for truthfulness. We disagree.[3]

Evidence of a witness's good character for truthfulness cannot be introduced unless his character for truthfulness has been attacked. *Gertz* v. *Fitchburg R.R.*, 137 Mass. 77, 78 (1884). *Commonwealth* v. *Grammo*, 8 Mass. App. Ct. 447, 455 (1979). The defendant's character for truthfulness was not attacked. Our cases hold that the offering of testimony that contradicts the testimony of a witness does not constitute an attack on the witness's character for truthfulness. *Atwood* v. *Dearborn*, 1 Allen 483, 483-484 (1861). *Brown* v. *Mooers*, 6 Gray 451, 451-453 (1856). Neither does the introduction of prior out-of-court statements of a witness constitute an attack on the witness's character for truthfulness. *Russell* v. *Coffin*, 8 Pick. 143, 153-154 (1829). As we have previously said, although "contradiction or proof of contradictory statements may very well

---

[3] We note that the defendant does not contend that evidence of his reputation for truth and veracity was relevant to establish the improbability of his having committed the offense of possession of cocaine with intent to distribute. See *Commonwealth* v. *Belton*, 352 Mass. 263, 268, cert. denied, 389 U.S. 872 (1967); *Commonwealth* v. *Beal*, 314 Mass. 210, 230 (1943).

have the incidental effect of impeaching the character for truth of the contradicted witness in the minds of the jury, the proof is not directed to that point. The purpose and only direct effect of the evidence are to show that the witness is not to be believed in this instance. But the reason why he is not to be believed is left untouched. That may be found in forgetfulness on the part of the witness, or in his having been deceived, or in any other possible cause. The disbelief sought to be produced is perfectly consistent with an admission of his general good character for truth, as well as for the other virtues; and until the character of a witness is assailed, it cannot be fortified by evidence." *Gertz* v. *Fitchburg R.R., supra.* The introduction of evidence that the defendant had made inconsistent out-of-court statements regarding the identity of Howie Tuna did not constitute an attack on the defendant's character for truthfulness. The judge was correct in refusing to permit defense counsel to elicit from Brooks testimony as to the defendant's reputation for truthfulness.

4. *Examination of prospective jurors.* The defendant requested the trial judge to ask prospective jurors on voir dire whether they would believe the testimony of a law enforcement officer more than that of any other witness. The defendant contends on appeal that the judge's refusal to ask this question was an abuse of discretion and denied him due process.

The judge did not commit constitutional error. We have consistently held that "[q]uestions not aimed at 'revealing racial bias or any similarly indurated and pervasive prejudice' are not constitutionally required" on voir dire. *Commonwealth* v. *Estremera*, 383 Mass. 382, 387 (1981), quoting *Commonwealth* v. *Rhoades*, 379 Mass. 810, 821 (1980). *Commonwealth* v. *Bailey*, 370 Mass. 388, 399 (1976). The defendant's question was not aimed at revealing any prejudice as "indurated and pervasive" as racial bias. *Id.*

Traditionally, we have accorded wide discretion to trial judges in probing prospective jurors for bias. See *id.* at 400; *Commonwealth* v. *Harrison*, 368 Mass. 366, 371, 372-373

(1975); *Commonwealth* v. *Lumley,* 367 Mass. 213, 216 (1975). Thus, there was no abuse of discretion in this case unless G. L. c. 234, § 28, as amended through St. 1975, c. 335, required the judge to put the requested question to the prospective jurors.

The first paragraph of § 28 provides in pertinent part that, upon motion of either party, the trial judge shall examine each prospective juror "to learn whether he is related to either party or has any interest in the case, or has expressed or formed an opinion, or is sensible of any bias or prejudice, therein." These subjects of inquiry are mandatory, and the trial judge has no discretion to deny a request that these questions be posed. The first paragraph further provides: "If the court finds that the juror does not stand indifferent in the case, another shall be called in his stead."

The second paragraph of § 28 provides in pertinent part: "For the purpose of determining whether a juror stands indifferent in the case, if it appears that, as a result of the impact of considerations which may cause a decision or decisions to be made in whole or in part upon issues extraneous to the case, including, but not limited to, community attitudes, possible exposure to potentially prejudicial material or possible preconceived opinions toward the credibility of certain classes of persons, the juror may not stand indifferent, the court shall . . . examine the juror specifically with respect to such considerations, attitudes, exposure, opinions or any other matters which may, as aforesaid, cause a decision or decisions to be made in whole or in part upon issues extraneous to the issues in the case." This provision requires the judge to examine a juror specifically "if it appears that . . . the juror may not stand indifferent." The judge must make the initial determination whether "it appears that . . . the juror may not stand indifferent," *Commonwealth* v. *Nickerson,* 388 Mass. 246, 249 (1983), *Commonwealth* v. *Hobbs,* 385 Mass. 863, 873 (1982), and that decision will not be disturbed on appeal unless the complaining party demonstrates that there was a substantial risk that the case would be decided in whole or in part on the basis of extrane-

ous issues. See *Commonwealth* v. *Hobbs, supra; Commonwealth* v. *Sanders*, 383 Mass. 637, 639-640 (1981); *Commonwealth* v. *Shelley*, 381 Mass. 340, 352-353 (1980); *Commonwealth* v. *Campbell*, 378 Mass. 680, 696 & n.12 (1979).

Although we think that ordinarily a trial judge should comply with a defendant's request to ask prospective jurors whether they would give greater credence to police officers than to other witnesses, in a case involving police officer testimony, the defendant's claim of error fails here because he has failed to show that there was a substantial risk that this case would be decided in whole or in part on the basis of extraneous issues, such as "preconceived opinions toward the credibility of certain classes of persons." He alleges only that "virtually the entire case" against him consisted of a clash of credibility between police officers and himself, and that there is a "widespread belief" among the general public that a police officer is more credible than an ordinary citizen. This bare allegation that the alleged "widespread belief" so infected the venire from which the defendant's jury was selected as to render the jury "unable to [reach] an impartial verdict on the evidence presented to them," *Commonwealth* v. *Dickerson*, 372 Mass. 783, 793 (1977), is an insufficient foundation for challenging the judge's action. See *Commonwealth* v. *Shelley, supra; Commonwealth* v. *Jones*, 9 Mass. App. Ct. 103, 115 (1980), modified on other grounds, 382 Mass. 387 (1981).

5. *Instructions on reasonable doubt.* The defendant asserts that there were several errors in the judge's charge. Only one of the asserted errors merits extended discussion. The defendant argues that the charge on reasonable doubt reduced the Commonwealth's quantum of proof below the standard of proof required by the United States Constitution. See *In re Winship*, 397 U.S. 358, 364 (1970). Under Mass. R. Crim. P. 24 (b), 378 Mass. 895 (1979), "[n]o party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, specifying the matter to which he objects and the grounds of his objection." The defendant failed

to object at trial to those portions of the charge which he now claims were erroneous. Consequently, the only question before us is whether the charge as given created a "substantial risk of a miscarriage of justice." *Commonwealth* v. *Berth*, 385 Mass. 784, 786 (1982).

We set forth in the margin relevant portions of the charge, indicating by italics those portions of the charge about which the defendant now complains.[4] The defend-

---

[4] "Every person appearing in a Court of law charged with a crime is cloaked with what we call 'the presumption of innocence.' You will have a copy of the Indictment that will be sent down to you. What is an Indictment? It is a piece of paper that is sent down by a Grand Jury that tells this gentleman what he is charged with. Then they give it to me so that I can tell you what he is charged with. It is merely an informational document, and no adverse inference is to be drawn as a result of the fact of that indictment being issued. He was arrested, if you recall, and there is no adverse inference to be drawn as a result of the fact that he is arrested and indeed appears before you these last few days, before the bar of justice, and he is charged with a crime, and there is no adverse inference to be drawn from that.

"The burden of proof, ladies and gentlemen, rests solely upon the Commonwealth. The Defendant is required to say absolutely nothing. He can sit back and take the pose of the great Shawmut Indian, fold his arms, and say, 'Go ahead.' The sole burden rests upon the Commonwealth to prove each and every material allegation necessary to establish the violations of the statute. What is that? That the Defendant possessed a controlled substance . . . with the intent to distribute it . . . . Those are the two essential elements of the crime which have to be proved beyond a reasonable doubt.

". . . .

"What does beyond a reasonable doubt mean? First of all, let me tell you what it doesn't mean so you can get that right out of your minds. It doesn't mean to a *slight or mathematical certainty*. We do not impose upon the Commonwealth the burden of proving anybody guilty to an *absolute or mathematical certainty.* . . . If that were the standard, with all due respect, I could substitute a small sophisticated computer and the 12 of you could have been home in your last few days enjoying yourselves and doing your daily things.

"Now, it is not a standard which requires proof beyond *all possible or imaginary doubt*. Listen, the working of the human mind is marvelous. It is capable of fantasizing in some way, shape, or form, imagining anything, delving into a realm of possibility. Virtually everything is possible. That is not the standard that we impose upon the Commonwealth, and it is indeed not the standard that we say to you that you must use in determining the Defendant's guilt.

ant's first objection to the charge is that it defined the concept of reasonable doubt in negative terms and warned the

"You see, if that is the standard that we employ; that is, *proof beyond all possible or imaginary doubt* or to an *absolute or mathematical certainty, then under those circumstances, ladies and gentlemen, I charge you that virtually every person accused of any crime be it running a stop sign or a stop light, or a minor traffic violation or murder in the first degree, virtually every such accused person* would walk out a free man if those were the standards: *absolute certainty, all certainty beyond all possible or imaginary doubt, certainty to a mathematical degree.*

"Now, a few of you may have heard me say this before. In 1850, 130 years ago, our Supreme Court in a case called Commonwealth v. Webster, *Dr. Webster was a practitioner in Beacon Hill in Boston with whom it was a thing to cut up people and bury them in odd places. Dr. Webster's story was tried, convicted, and appealed.* It was in 1850 that our then Supreme Court spelled out what 'beyond a reasonable doubt' meant; and we trial judges are reminded a couple of times a year by the Supreme Court as we labor with people like yourselves and try to explain this concept, that we, no matter how we try, we can't improve upon the language set forth 130 years ago. I am going to tell you what that is. It may sound somewhat familiar.

" 'The burden is upon the Commonwealth to prove beyond a reasonable doubt that the Defendant is guilty of the charges against him. A verdict of guilty cannot be based upon a mere prejudice, presumption, speculation, or suspicion. What is a reasonable doubt? The term is often used, pretty well understood, but not easily defined. It is not mere possible doubt because everything relating to human affairs and depending upon moral evidence is open to some possible or imaginary doubt. Reasonable doubt is that state of the case when after the entire consideration of all of the evidence, the minds of the jurors are left in that condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge.

" 'The burden of proof is upon the prosecutor and all presumptions of law under the evidence are in favor of his innocence. Every person is presumed to be innocent unless he has proved him guilty. If upon such proof there is a reasonable doubt remaining, the accused is entitled to a benefit of acquittal. It's not sufficient to establish possibility, though a strong one, arising from the doctrine of chances that the facts charged [are] more likely to be true than contrary; but the evidence must establish the truth of the facts to a reasonable and moral certainty. A certainty that convinces and directs the understanding and satisfies his reason in judgment of you, the jurors, who are bound to act cautiously upon it.' This we take to be beyond a reasonable doubt.

"A few moments ago I alluded to the fact that the Defendant comes into Court and the burden of proof is upon the Commonwealth. The reason for that is the Defendant is presumed to be innocent. Now, the presumption of innocence is a rule of law, and it creates for every Defendant a

jury of the consequences of holding the prosecution to too high a standard of proof. The judge instructed the jury that proof beyond a reasonable doubt does not mean proof to an "absolute or mathematical certainty" or proof beyond "all possible or imaginary doubt," and that, if those standards were applied, "virtually every person accused of any crime . . . would walk out a free man." In considering each of the defendant's claims of error, we "view the charge in its entirety since the adequacy of instructions must be determined in light of their over-all impact on the jury." *Commonwealth* v. *Festa,* 388 Mass. 513, 515 (1983), quoting *Commonwealth* v. *Sellon,* 380 Mass. 220, 231-232 (1980).

The challenged language apparently was taken from the jury instruction appearing in the preface to *Commonwealth* v. *Madeiros,* 255 Mass. 304, 307 (1926). The relevant portion of the *Madeiros* charge reads: "Proof beyond a reasonable doubt does not mean proof beyond all doubt, nor beyond a whimsical or fanciful doubt, nor proof beyond the

---

cloak, a covering, a protection; and that presumption stays with him throughout the trial unless and until evidence is presented to you, ladies and gentlemen, which would convince you beyond a reasonable doubt that the presumption of innocence is nonexistent.

"Now, what is this man charged with? Simply a violation . . . ; no person shall knowingly or intentionally possess with the intent to distribute a controlled substance. . . . Now, one of the first things I told you about the crime is that the person who is accused must possess the controlled substance. . . . Secondly, that he did so knowingly. *Listen, if somebody delivers a package to your home this afternoon, and someone in your house accepts it and it contains heroin, don't worry about it.* Not unless that member of your family knew darn well what was in the box. So, the Commonwealth must prove that the possession was done knowingly and intentionally; that is to say, voluntarily, purposely, and not really by accident or mistake. . . .

" . . . . .

"Ladies and gentlemen. I repeat to you: You owe duties to each one of these parties, to the Commonwealth to bring in a verdict of guilty if you are convinced beyond a reasonable doubt of all the essential elements of the crime as charged; and in the event that you are not convinced beyond a reasonable doubt of the intention to distribute, but indeed are convinced of all of the other elements of the crime, then you have the alternative of bringing back a verdict of guilty of simple possession of a controlled substance." (Emphasis added.)

possibility of innocence. . . . If an unreasonable doubt or a mere possibility of innocence were sufficient to prevent a conviction, practically every criminal would be set free to prey upon the community. Such a rule would be wholly impractical, and would break down the forces of law and order, and make the lawless supreme." Although we stated in 1979 that this language had generally been cited with approval, *Commonwealth* v. *Williams,* 378 Mass. 217, 233 (1979), recent cases have recognized that that type of charge is defective because it warns of the consequences of holding the prosecution to too high a standard of proof without warning of the "substantial harm inherent in evaluating the prosecution's case against a lower standard." *Id.* at 233-234. An additional defect in the *Madeiros* type of charge is that it invites the jurors' attention to the general consequences of their verdict rather than to their obligation to decide the case on the evidence adduced at trial. *Id.* at 234. See also *Commonwealth* v. *Tavares,* 385 Mass. 140, 148 ("[t]he emotional overtones of [the *Madeiros*] rhetoric may be criticized as subtly encouraging a jury to accept less proof than it should, so that 'the lawless' will not be 'supreme'"), cert. denied, 457 U.S. 1137 (1982), quoting *Bumpus* v. *Gunter,* 635 F.2d 907, 911 (1st Cir. 1980), cert. denied, 450 U.S. 1003 (1981). The defendant argues also that it was improper for the judge to give a one-sided negative definition of reasonable doubt by explaining what reasonable doubt is not, rather than what it is.

Without condoning these aspects of a *Madeiros*-type charge, we have upheld instructions containing similar language in several recent cases. See *Commonwealth* v. *Tavares, supra* at 147-148 (no substantial likelihood of miscarriage of justice, in a case arising under c. 278, § 33E, where judge stated five times that the Commonwealth had the burden of proving every essential element of the crime beyond a reasonable doubt, and defined reasonable doubt in the language of *Commonwealth* v. *Webster,* 5 Cush. 295, 320 [1850]); *Commonwealth* v. *Spann,* 383 Mass. 142, 150-151 (1981) (no error where judge charged jury on presump-

tion of innocence and stated that proof beyond a reasonable doubt required proof to a moral certainty on each element of crime charged); *Commonwealth* v. *Carballo*, 381 Mass. 227, 229 (1980) (no cause for reversal under § 33E, where defendant took no exception to charge, and where judge charged in detail on presumption of innocence, repeatedly charged that Commonwealth bore the burden of proof, and defined reasonable doubt in terms of moral certainty); *Commonwealth* v. *Hughes*, 380 Mass. 596, 600-601 (1980) (charge not so one-sided as to present a substantial risk of miscarriage of justice); *Commonwealth* v. *Williams*, 378 Mass. 217, 231-235 (1979) (no "grave prejudice" to defendant, and no error in instructions, where judge admonished jury that "no innocent person be convicted or punished," defined reasonable doubt in terms of moral certainty and in the language of *Commonwealth* v. *Webster, supra,* and employed the unadorned phrases "reasonable doubt" and "moral certainty" in formulating specific questions for decision); *Commonwealth* v. *Seay*, 376 Mass. 735, 745-746 (1978) (no error in instruction which defined reasonable doubt negatively, where judge also defined reasonable doubt in terms of "moral certainty" and a "clear and settled conviction").

The charge in this case is less objectionable than the charge given in many of the cases cited above. The negative definition of reasonable doubt was balanced by the judge's statement that the mere "possibility, though a strong one," of the defendant's guilt was not sufficient to convict, and by his positive definition of reasonable doubt in terms of "moral certainty" and an "abiding conviction."

The judge's warning of the consequences of holding the Commonwealth to too strict a standard of proof was balanced in part by the statement that "[a] verdict of guilty cannot be based upon a mere prejudice, presumption, speculation, or suspicion," and by the judge's emphasis throughout his charge that the jury's verdict must be based on the evidence presented at trial. The judge's definition of reasonable doubt in terms of moral certainty, his repeated

admonitions that the Commonwealth bore the burden of proving the defendant's guilt beyond a reasonable doubt, and his emphasis on the presumption of innocence which cloaked the defendant also helped to mitigate any negative effect of the judge's one-sided warning. We also note that the warning in this case lacked the strong "emotional overtones" of the *Madeiros* rhetoric. See *Commonwealth* v. *Tavares*, 385 Mass. at 148. The *Madeiros*-inspired portion of the judge's charge, although we continue to disapprove of that language, created no substantial likelihood of a miscarriage of justice.

The defendant's remaining claims of error are without merit. Relying on *Commonwealth* v. *Pomerleau*, 10 Mass. App. Ct. 208 (1980), the defendant claims that the judge's instructions impermissibly "related" the defendant to the infamous Dr. Webster. We do not agree, and we do not agree that the defendant could have been harmed by the statement that the jurors need not worry "if somebody delivers a package to your home this afternoon, and someone in your house accepts it and it contains heroin." The judge's statement, which really was an aside, did have the merit of focusing the jurors' attention on whether the defendant knowingly possessed the cocaine. The defendant's final contention is that the summary of the possible verdicts was one-sided, and reversal is required because the summary did not specifically mention that the defendant could be found innocent of all charges. The judge instructed the jurors that it was their duty to return a verdict of guilty only if they were "convinced beyond a reasonable doubt of all the essential elements of the crime charged." Although it would have been better for the judge to mention specifically the option of acquittal, we think that conditioning the entry of any guilty verdict upon proof beyond a reasonable doubt of the crime charged obviated any substantial likelihood of injustice to the defendant.

*Judgment affirmed.*

Commonwealth *v.* Sheline.

ABRAMS, J. (concurring, with whom Nolan, J., joins). As I read the record, the judge's exclusion of reputation evidence was based on the failure of defense counsel to lay the foundation that would qualify the witness to testify to the defendant's reputation.[1] The judge could reasonably have ruled that the defendant failed to show that the witness's sources were sufficiently numerous and general to permit the witness to testify to the defendant's reputation for truthfulness. See *Commonwealth* v. *United Food Corp.,* 374 Mass. 765, 769 (1978). Compare *Commonwealth* v. *Belton,* 352 Mass. 263, 269 (narrow compass of business associations; "single occasion upon which the witnesses heard any report of his character expressed"), cert. denied, 389 U.S. 872 (1967); *Commonwealth* v. *Baxter,* 267 Mass. 591, 592-593 (1929) (testimony based on interviews of five-named persons); *Commonwealth* v. *Porter,* 237 Mass. 1, 3-4 (1921) (defendant's reputation discussed exclusively in the family of witness's father-in-law, who was the defendant's employer); *Commonwealth* v. *LaPierre,* 10 Mass. App. Ct. 871 (1980) (testimony of waitress based on reputation among two other waitresses and a cook). See also P.J. Liacos, Massachusetts Evidence 148-149 (5th ed. 1981).

---

[1] The witness testified as follows:

DEFENSE COUNSEL: "How long have you known Mr. Sheline?"

THE WITNESS: "Approximately three years."

DEFENSE COUNSEL: "Where have you known him?"

THE WITNESS: "Gloucester."

DEFENSE COUNSEL: "Do you know his reputation for truth and veracity?"

THE PROSECUTOR: "Objection."

THE JUDGE: "The question is asked without proper foundation."

DEFENSE COUNSEL: "May I try again, Your Honor?"

THE JUDGE: "Yes."

DEFENSE COUNSEL: "You have known Mr. Sheline where?"

THE WITNESS: "Gloucester."

DEFENSE COUNSEL: "In what community in Gloucester, among what sort of people?"

THE WITNESS: "In restaurants, down in Bob's Clam Shack, down at the marina."

DEFENSE COUNSEL: "Are you aware of the truth and veracity among the individuals in the community?"

THE PROSECUTOR: "Objection."

THE JUDGE: "Sustained."

I believe that the judge correctly permitted the defendant to try to lay a foundation for reputation testimony despite the fact that the defendant had not yet testified, and therefore his reputation for truthfulness had not yet been attacked. Where, as in this case, it is clear that the defendant intends to testify, and that the prosecutor will attempt to impeach him through cross-examination, I would not require a judge to wait until after the defendant has been cross-examined to permit a witness to testify to the defendant's reputation for truthfulness.

I believe that the rules of evidence can and should accommodate the needs of witnesses as well as those of the court and the litigants. I think it to be the better practice to admit such evidence de bene on the assurance that the defendant will testify, and that the Commonwealth will cross-examine him in an effort to impeach the defendant's credibility. The record reflects that these conditions were met. The rule that the court adheres to would have required the witness to return to court a second time to answer questions concerning the defendant's reputation for truthfulness. See P.J. Liacos, Massachusetts Evidence 166 (5th ed. 1981). In my view this inconvenience to the witness does not serve any valid purpose in the administration of justice.

"The convenience of the jurors, the court, and the witnesses may all be best served by receiving the testimony 'out of order' in certain circumstances, subject to an avowal by counsel that such testimony will later be 'tied in' . . . . [T]rial judges . . . are in a far better position than are we to know whether, as a matter of the order of presenting witnesses and evidence, testimony from a particular witness may be allowed 'out of order' subject to avowal, proffer, and the various other devices employed to avoid wasting the time of the court and the jury with testimony that is irrelevant while at the same time avoiding if possible the necessity for recalling or seriously inconveniencing a witness." *United States v. Bailey*, 444 U.S. 394, 412 n.9 (1980). "Witnesses are the lifeblood of the system. Without them, few wrongdoers would be brought to justice for their acts, nor would there

be any evidence to present in criminal cases. And yet no consideration is given to their needs or to the inconvenience that having to appear in court may cause them." L. Katz, Justice Is the Crime 54 (1972). I commend the judge for trying to spare the witness the ordeal of an additional appearance in court.