COMMONWEALTH vs. RANDALL HEATH
(and a companion case[1]).

Worcester. March 9, 1987. — July 7, 1987.

Present: GREANEY, C.J., CUTTER, & KASS, JJ.

*Rape. Joint Enterprise. Evidence*, Impeachment of credibility, Fresh complaint. *Witness*, Credibility. *Practice, Criminal*, Instructions to jury.

At the trial of two defendants charged with rape, error, if any, in the judge's restricting one defense counsel's examination of a witness, called by the other defense counsel, on the issue of the victim's state of mind as a foundation for an argument that the victim had a motive to fabricate the charges, was harmless, where any evidence to be adduced from the witness would have been only cumulative of other evidence which gave basis for that argument, and where the defendant showed no prejudice from the limitations placed by the judge. [441-445]

At the trial of two defendants on indictments for rape, the failure of the judge to give a limiting instruction as to fresh complaint evidence, which defense counsel expressly declined to request, created no risk of a miscarriage of justice. [445]

At the trial of two defendants on indictments for aggravated rape, jury instructions on joint enterprise as a requirement, in the circumstances, for conviction of the defendants were adequate. [445-446]

INDICTMENTS found and returned in the Superior Court Department on April 3, 1985.

The cases were tried before *Andrew G. Meyer*, J.

*Jane Larmon White*, Committee for Public Counsel Services, for Mark Leger.

*Warren M. Yanoff* for Randall Heath.

*Claudia R. Sullivan*, Assistant District Attorney, for the Commonwealth.

CUTTER, J. These defendants, Heath and Leger, appeal from convictions in August, 1985, of aggravated rape of a

---

[1] Commonwealth v. Mark Leger.

young woman (the victim), then sixteen years old. The defendants assert errors at their trial principally in the exclusion of evidence and in the judge's instructions to the jury. The evidence permitted the jury to make the following findings.

The victim (who lived in Gardner) and two other young women had taken an examination at a community college during the early evening of November 7, 1984. After the examination, the victim made a telephone call to her mother and told her, untruthfully, that she was going to the movies. The victim then persuaded one of the other young women, then nineteen years old, named Nancy, and the other, whose name was Sharon, to go out for drinks with her that evening. She told them that she and her "boyfriend" had engaged in an argument that day and that she (the victim) was "depressed."

The three were given a ride to Leominister. A bottle of schnapps was passed around in the automobile from which the victim had some sips. They first went to a Chinese restaurant, where, so the victim testified, she had nothing to eat or drink. They then went to a bar and lounge, where the victim (using Sharon's identification card) bought a drink (known as a "Zombie").[2] Less than an hour later, they walked to Skampi's, a bar nearby, where they arrived about 11 P.M. The victim there gained admission by using a card supplied to her by Sharon. They remained there for two to three hours, listening to the band and dancing. There, so the victim testified, she had only ginger ale to drink.

The victim then realized that they had no ride home and discussed it with the other young women. She was informed by one of them that they had a ride. This turned out to be with the defendants. There was testimony that Sharon had met one of the defendants previously.

The three young women then left Skampi's with the two defendants to go to Sharon's "boyfriend's house" where they were "supposed to get a ride home." Leger (thirty years old, and described as at least six feet, three inches, in height and

_____

[2] American Heritage Dictionary, at 1407 (2d College Ed. 1982) defines this beverage as a "tall drink made of various rums, liqueur, and fruit juice."

as weighing about two hundred and forty pounds) was driving a white automobile. With him in the front seat were Sharon and Heath. The victim and Nancy were in the back seat.

Sharon (who was not a witness at trial) decided to stay at her friend's house, but no ride was there available. The other two young women asked the defendants for a ride to Gardner. The defendants said they had to meet someone first. The two women then went with the defendants to the apartment of a friend of one of them, where there was one other young woman. While there for over an hour, the victim, Nancy, and each defendant "snorted" cocaine which was supplied by Leger. The victim was offered a valium pill, which she at first refused, but consumed a short time later, after Nancy had told her that the pill looked like a valium, not a tic-tac (candy) tablet, as the victim might have thought in view of the container from which it came. This the victim said made her feel "high." When the four left the party, Nancy and the victim asked to be taken home. The automobile was then driven along Route 2 to Gardner. En route the victim and Nancy discussed where the victim should spend the night. Nancy refused to let the victim stay with her and either had no telephone or did not permit its use.

At her own house, which was only about a mile from the victim's house, Nancy left the automobile. This left the victim alone in the automobile with the defendants. Instead of taking the victim to her home, the defendants went back to Route 2 and headed toward Fitchburg and Leominster.

At some point near the Leominster water treatment facility, Leger pulled off Route 2 onto a dirt shoulder. Leger walked to the rear door on the passenger side of the vehicle. Heath opened the rear door on the driver's side, held the victim's wrists, and forced her to lie down on the rear seat. Leger then "[p]ulled down . . . [her] jeans" to her ankles, while Heath held her hands over her head. Leger then pulled his jeans down, got on top of her, and "put his penis into . . . [her] vagina." The victim told him to stop and struggled with him. After about thirty seconds, she "pulled . . . [her] knee up and kicked him out." Leger "then put his finger into" her. She

again pushed him away. The defendants then closed the rear doors and returned to the front seat. She put on her clothes. Her underwear, which had been in good condition earlier that day, had been ripped.

The defendants then discussed going to the "Swiss [Susse?] Chalet" motel. The victim told the defendants that she did not want to go there, but "wanted to go home." At the motel, Leger went inside, while Heath remained in the automobile. The victim testified that she started to get out, but Heath "pulled [her] arm to get back in."[3]

Leger returned from the motel office and said that they were going to the Holiday Inn. There Leger left the vehicle and Heath moved toward some bushes near the parking lot to relieve himself. The victim hastily left the automobile and entered the inn through a door other than the door Leger had used. She eventually found the desk clerk and asked him whether "he had given the guy that had just come in a room and he said no." She then asked the night clerk to call the police. He dialed and the victim told whoever answered that she "had been raped." The police soon arrived and she went with them to the Leominster Hospital. There were marks on her crotch and one ring she was wearing was "all bent out of shape."

After some tests at the hospital, she went with Officer Benoit of the Leominster police to the Leominster police station. Then, with Officer Benoit and her mother (who had come to the hospital), she went in a police cruiser to the point on Route 2 near the water treatment plant where she pointed out the scene of the defendants' attack upon her.

Officer Benoit testified, not only to the account the victim gave him at the hospital[4] of the assault upon her, but also about

---

[3] This testimony, defense counsel (on cross-examination) tried to show, was inconsistent with prior statements by the victim which never mentioned that Heath had attempted to restrain her by holding her. There was testimony that near the Chalet there was a lighted restaurant, where the victim observed people and automobiles. Heath testified that about that time he had asked the victim "if she did feel uncomfortable being here with two guys" at a motel at 4:30 in the morning. The victim replied that she did.

[4] Analysis at the State police laboratory of the victim's underwear and of the rape kit prepared at the hospital revealed no seminal fluid.

his examination of the site of the attack on Route 2 at 6:30 or 7:00 A.M. on November 8, 1984. There he observed tire tracks leading off Route 2 "going through the sand and gravel [shoulder] onto the grass area and then the tracks continued on back onto the roadway." Officer Benoit got out of his cruiser to look at the lonely, unlighted site, but was unable to make "any determination as to any type of tread."

Each defendant took the stand. In various respects they contradicted the victim (called by the prosecution), and Nancy (called by the defendant Heath's attorney). Each defendant denied that there had been any stop on Route 2 or any attack upon the victim. Leger testified that at the Holiday Inn as he returned to the automobile he met the victim walking away from it. Heath testified that the victim had said to him then that she was "going to call some friends, it's been fun." There was conflicting testimony about what the conversations in the automobile had been, about whether the victim and Nancy at various stages of the evening had asked to be taken home, and about other matters.[5]

Upon the evidence the jury found both defendants guilty of aggravated rape. Leger was sentenced to twenty years at M.C.I., Concord (one and a half years to be served and the balance suspended, with probation for five years on and after the sentence). Heath was given a similiar sentence, but with one year to be served.

## Discussion

1. Leger's appellate counsel contends that the victim's claim that she had been raped might have been found by the jury to have been a fabrication if they had known that the victim "had a motive to lie on the morning of November 8, 1984."[6] Heath's

---

[5] The night clerk at the Holiday Inn, for example, described the victim as physically fine but emotionally "rather distraught" and as starting "to cry after the phone call," whereas the victim had testified that she had been "crying . . . and upset" just before and as she entered the inn, and talked to the night clerk.

[6] Leger's brief describes the defense theory as that the victim "was sufficiently depressed over a rift with her boyfriend so as to be suicidal"; that this was what prompted Sharon and Nancy to join her for an evening

trial counsel had called the victim's companion, Nancy, as a witness. Leger's trial attorney at a bench conference indicated that he wanted to bring out from Nancy details of conversations with the victim both before and during their travels on the night of November 7-8, 1984. Nancy had mentioned such conversations in a statement[7] given (on a date not specified either in this record or in the statement itself) to a defense investigator named Eaton. Eaton did not appear as a witness.

The trial judge declined to permit (a) Heath's counsel to ask Nancy leading questions, or (b) Leger's counsel to cross-examine Nancy except as to matters on which she had testified already on direct examination by Heath's counsel. "Otherwise," the judge told Leger's trial counsel, "we're treating her [Nancy] as your witness." It was pointed out to the judge that Leger's counsel wanted to prove that the victim was deeply worried because of her fear of angry action by her mother or by her boyfriend if she went either to her home or to the boyfriend's house at such a late hour.

The judge pointed out to Leger's counsel that the questions he had been asking were objectionable because they were leading, but that counsel was free to "elicit information about . . .

---

stopping at bars; that the victim sought to avoid, at 4 A.M., facing her mother (to whom she had lied about her plans); and that perhaps the claim of rape would arouse sympathy from her mother and from her boyfriend (to whose home she was reluctant to go because of fear that he would beat her).

[7] The statement was not marked at trial for identification. By stipulation of counsel however, it was filed in this court, pursuant to Mass.R.A.P. 8 (e), 378 Mass. 934 (1979), as a document to which defense counsel had referred at trial. Examination of the transcript at the pages mentioned in the stipulation does not indicate any specific reference to the document itself (even in bench conferences) but only general mention of what Nancy had told the investigator. The somewhat confused, typed statement said, among other things, that, when the victim asked Nancy and Sharon to go out with her, she had said of her boyfriend, "[H]e won't take me out, I'm going to kill myself," and that Nancy, when asked if that "was believable," had replied that the victim had "tried it before," and that while Nancy and the victim were together in the back seat of Leger's automobile, the victim had said to her, "Where can I sleep? I can't go home to my mother . . . My mother will kill me. I can't go to Dave's [her boyfriend]; he'll beat me up or something."

[the victim's] state of mind." He cautioned that defense counsel should not make by questions any "insinuation that . . . [the victim] stays at her boyfriend's house regularly and that the boyfriend beats her." This was obviously because of fear that there might be a violation of the so called rape-shield law (G. L. c. 233, § 21B).

Later (after intervening questions by other counsel and ineffectual efforts to get Nancy to remember the details of her conversations with the victim) Leger's counsel asked leave of the judge to "approach the witness in order to try to refresh her recollection." To this request, the judge replied, "No, you can stand right there and ask her questions." Counsel abandoned this inquiry after obtaining from Nancy testimony that the victim had been depressed because her boyfriend "went out with somebody else."

Substantial evidence had been admitted that the victim had been much upset and depressed over the disagreement with her boyfriend and that she had lied to her mother about where she was going. Officer Benoit had testified about seeing her at the Leominster Hospital where "[s]he was very uptight. She was angry. Her mother asked her questions and she was hostile in the answers." There had been testimony about her uncertainty at 3 A.M. or 4 A.M. about where she should go for the night and that she had discussed with Nancy in the automobile her various options. The jury also heard from witnesses that, because of the victim's argument with her boyfriend, she could not go to his house or sleep in his pickup truck.[8] They had heard evidence of her deceptive use of Sharon's identification card in places engaged in selling alcoholic beverages. This testimony had bearing either upon her state of mind or upon her credibility.

---

[8] The judge may have misunderstood the purpose of an attempted inquiry by Leger's trial counsel of the victim herself whether she was afraid to stay at her boyfriend's house the night of these events and excluded it because of the provisions of the rape-shield law, G. L. c. 233, § 21B. The transcript suggests that he thought counsel's inquiry was about to suggest a violation of that statute although the judge somewhat ambiguously suggested that questioning "may go to her state of mind." He excluded that inquiry "for the time being" and it was not pursued with the victim thereafter.

The scope and extent of cross-examination usually is within the sound discretion of the trial judge. See Liacos, Massachusetts Evidence, 66-68, 135-136 (5th ed. 1981 & Supp. 1985) and authorities cited; Hughes, Evidence, §§ 186-191 (1961 ed. & Supp. 1981). Nevertheless, the judge appropriately could have allowed Leger's counsel greater latitude in refreshing Nancy's recollection and in dealing with the "state of mind" of the victim. It may be that the question now raised really comes down to whether hearsay evidence about the victim's references to possible suicide[9] (and cumulative evidence about her fears of her mother and of her boyfriend) would sufficiently add to the evidence otherwise admitted to make harmless the error, if any, involved in the limitations placed by the trial judge on Leger's counsel's inquiry of Nancy.

Any basis for contending that the victim fabricated her charge of rape is much less direct than the circumstances in cases relied upon by Leger's counsel. Compare *Commonwealth* v. *Bohannon*, 376 Mass. 90, 94-96 (1978, where the exclusion of efforts to show that a victim had made prior false accusations of rape was held so to have prevented a sufficient attack on her credibility as to require a new trial); *Commonwealth* v. *Fetzer*, 19 Mass. App. Ct. 1024, 1025 (1985). In the *Fetzer* case, a rape complainant had been found "at the roadside partially clad, in a secluded area." It was held that "inquiry should have been permitted into the existence of a romantic relationship between . . . [a named male] and the complainant, as a foundation for . . . [an] argument that the complainant had a motive to lie concerning the voluntariness of her participation in sexual activity with . . . [that] defendant."

Here there was other admitted evidence which gave basis for the argument of fabrication now presented. We think that this admitted evidence (without amplification by proof of the victim's alleged remarks to Nancy on suicide and about the victim's boyfriend's possible reactions) sufficiently disclosed

---

[9] The victim had not been cross-examined on behalf of either defendant about her alleged talks to Nancy and Sharon about suicide. Defense counsel, however, in fact were allowed to develop on their final arguments their contentions that the victim had fabricated a rape claim.

the victim's "state of mind" and provided substantially equal basis (to that which might have been expected upon further inquiry) for a very slim charge of fabrication by the victim. The defendants have not shown that they were prejudiced by the limitations placed by the trial judge. See *Commonwealth v. Anderson*, 3 Mass. App. Ct. 463, 466 (1975), cert. denied 424 U.S. 926 (1976). See also *Welchel* v. *State*, 178 Ga. App. 727, 728 (1986). Compare *Commonwealth* v. *Thayer*, 20 Mass. App. Ct. 234, 236-237 (1985). Compare also *Commonwealth v. Elliot*, 393 Mass. 824, 828-831 (1985), and cases cited.

2. The defendants argue that the judge should have given a limiting instruction on fresh complaint with respect to the testimony of Officer Benoit and of the desk clerk at the Holiday Inn about what the victim had said to them, respectively. At the close of his charge, the judge gave defense counsel an opportunity to request such an instruction, which the judge thought might "complicate" the situation. Neither attorney made such a request. The "fresh complaint" testimony was essentially a cumulative repetition of the victim's own testimony. We perceive no risk that the failure to give the instruction, never requested, involved any risk whatsoever of a miscarriage of justice. See *Commonwealth* v. *Bailey*, 370 Mass. 388, 391-397, and especially at 393 (1976); *Commonwealth v. McCarthy*, 12 Mass. App. Ct. 722, 728 (1981).

3. The jury after somewhat brief deliberations submitted questions to the judge. Only one question put by them requires comment. The jury asked whether they could come to different verdicts for the two defendants. In his original instructions the judge had pointed out that the charges against these defendants for "aggravated" rape were based on the provision of G. L. c. 265, § 22 (as amended by St. 1980, c. 459, § 6), treating rape "committed by a joint enterprise" as "aggravated." He told them, that both defendants would be guilty if each "associated himself with the criminal venture and . . . participated to some extent in the commission of the crime." In supplemental instructions, he had added that the offense "has to be committed as a joint venture in order to be aggravated rape."

After considering the jury's question, the judge changed the jury slips so that they could find that the defendants were not acting in concert in which case the jury could return "a verdict of guilty of plain rape for one and not guilty of anything for the other." The jury must have understood that they could not convict either defendant of aggravated rape unless they found each of them to have been acting in a joint enterprise. Their verdict necessarily meant that they had found a joint enterprise. Although the instructions could have been given with greater clarity, they plainly gave opportunity for a verdict of not guilty for Heath (who alone now appears to complain of them), if they found that he had not participated.

*Judgments affirmed.*